## S. H. SUMMERS v. ROBERT MILLS AND OTHERS.

Where there was proposal by a letter, from country merchants to city merchants, to purchase an invoice of goods, and the proposal was accepted, nothing being said as to the terms, except that the proposal contemplated credit ; and the vendors went on to fill the order, and shipped the goods, marked in the name of the purchasers, to the care of an intermediate consignee, to whom or assigns the bill of lading was taken, and wrote a letter to the purchasers, enclosing the invoices and a duplicate of the bill of lading, and stating the terms of payment with which the purchasers were expected to comply, it was held that the contract of sale was not complete until the purchasers had accepted the terms of payment proposed, and that the vendors might abandon the sale and stop the merchandize in the hands of the intermediate consignee at any time before such acceptance.

To make a contract there must be a mutual assent. The assent must comprehend the whole of the proposition ; it must be exactly equal to its extent and provisions, and it must not qualify them by any new matter.

Where the proposition of the seller is that the notes for the purchase money shall be payable at a particular place with interest, it must be taken to mean interest at the rate allowed by law at that place, if different from the rate allowed at the place where the proposition is made.

This case distinguished from a case where after a contract of sale, which specified the terms and manner of payment, the purchaser, while the goods were *in transitu*, proposed a different manner of payment.

See this case for a letter proposing to purchase goods upon credit, which, under the facts in evidence, was held to be calculated to make a false impression upon the sellers, as to the credit and responsibility of the writer.

Appeal from Galveston. Tried below before the Hon. Jas. H. Bell.

On the 17th of June, 1854, S. H. Summers & Co., wrote a letter from La Grange, to Whitney, Fenns, Shaw & Co., Boston, as follows :

Enclosed please find order for sundries, which we have taken the liberty of sending to your house. We are sending out our orders a little earlier than usual this season, so as to get them hauled from Houston at low freights. The firm of our house has formerly been Summers & Dabney. Mr. D. having withdrawn, it now is S. H. Summers & Co. In regard to solvency we refer you to Messrs. Dana, Faran & Hyde, of your city, and Messrs. Church & McKellopp, New York. Hoping the above reference will be satisfactory, and our future acquaintance prove profitable, we remain, &c.

Postscript as follows : Our business is about $20,000 per annum, and, we can assure you, on safe principles.

July 22nd, Whitney, Fenns, Shaw & Co., replied as follows :

Your favor of June 17th came duly to hand, enclosing an order for goods, for which please accept our thanks. We have been waiting for several days for a Galveston packet, which has not yet arrived, but is hourly expected. We shall ship them by the very first packet from this port. You say nothing about insurance, but we shall have them insured here, as usual, unless you advise us to the contrary. We should be much pleased to see you at the North, and in the meantime remain, &c.

On the 29th of July, Whitney, Fenns, Shaw & Co., wrote another letter to S. H. Summers & Co., as follows :

We take much pleasure in handing you invoices for goods ordered, which we have shipped per bark Helen, which we trust will arrive safely and in due season, and give perfect satisfaction. She is to sail very soon. Please notice that we have insured the goods to Houston only, which we trust will be agreeable to your wishes. The gentlemen's guantlets we were entirely unable to find in our market; also the white

kerseys. which are not now made here.   We send you a case of Georgia plains, at the agent's price. which, we have no doubt, will please you.   We were in doubt whether you wanted bleached linen thread or white brown, and have therefore sent you a small quantity of each.   Please return us your notes payable in six months, and if agreeable at the office of R. & D. G. Mills, Galveston, with exchange.   If you want longer time please add the interest after six months, and make them as short as you can conveniently meet them.

Enclosed in the letter of July 29th, was a bill of lading for the goods, which were to be delivered at Galveston o J. Shackelford or assigns ; the boxes and packages were marked S. H. Summers & Co., La Grange, Texas, care of J. Shackelford, Galveston.   The invoices amounted to $1976 50.   The goods arrived at Galveston about the 1st of September.

In the meantime on the 15th of July, Whitney, Fenns, Shaw & Co., wrote to R. & D. G. Mills, Galveston, making inquiries as to the standing and responsibility of S. A. Summers & Co.; to which R. & D. G. Mills replied on the 11th of August, giving information which was verified by the evidence in this case ; upon receipt of which, Whitney, Fenns, Shaw & Co. forwarded to R. & D. G. Mills a duplicate bill of lading, and requested them to stop the goods, and not to permit S. H. Summers & Co., to have them unless they would give security to pay for them.

September 6th, R. & D. G. Mills wrote to S. H. Summers & Co., that they were authorized to forward the goods, if S. H. Summers & Co. would give their notes, with approved security, for the amount of the invoice, at six months, or an acceptance of a respectable firm in Houston or Galveston at twelve months, with interest after six months, payable at Galveston, with exchange on Boston or New York.

September 7th, Shackelford advised S. H. Summers & Co., by letter, of the stoppage of the goods by R. & D. G. Mills, under power from Whitney, Fenns, Shaw & Co., and a duplicate bill of lading.

September 9th, S. H. Summers & Co., wrote to Whitney, Fenns, Shaw & Co., enclosing two notes payable at nine and twelve months from the date of the invoices, at the office of Ennis & Co., Houston, with interest at six months at seven per cent., computed as principal, and without exchange.

Immediately on receipt of said notes by Whitney, Fenns, Shaw & Co., they transmitted them to R. & D. G. Mills, saying that they did not object to the time, if S. H. Summers & Co. would give such names, in connection with their own, as would satisfy R. & D. G. Mills, that the paper would be paid promptly ; and the notes were, on receipt thereof by R. & D. G. Mills, immediately sent by them to S. H. Summers & Co., who refused to receive them, and refused to comply with the terms demanded.    And S. H. Summers, alleging that he constituted the firm of S. H. Summers & Co., brought this action against R. & D. G. Mills and Shackelford to recover damages for wrongful detention of the goods, including damages for the injury to his business as a merchant.

Plaintiff introduced evidence tending to show that he was a good business man ; of steady habits ; that he had sustained a good character, and received credit from persons who knew him ; and that his business amounted to fifteen thousand dollars a year ; also evidence as to the damage caused by the stoppage of the goods.

A witness for plaintiff testified that he was in Boston when Whitney, Fenns, Shaw & Co., received plaintiff's order, and being called upon by them to answer inquiries as to the respectability of character, responsibility and business capacity of plaintiff, answered that his respectability of character, responsibility and business capacity were undoubted ; and that Whitney, Fenns, Shaw & Co. came to the conclusion from the answers of witness, that plaintiff was sufficiently responsible, and expressed a determination to fill the bill of goods and ship them to plaintiff.

Defendants proved that plaintiff had only commenced mer-

chandizing on his own account in the Summer or Fall of 1853 ; that he did not pretend to have a cash capital ; was furnished by C. Ennis & Co., of Houston, with goods to set up with at La Grange ; paid them one thousand dollars in cash ; and was not known to have any other capital ; had been clerk for C. Ennis & Co., in 1853. There was no evidence that plaintiff was insolvent at the date of the transaction in controversy.

The Court instructed the jury as follows :

That unless Messrs. Whitney, Fenns, Shaw & Co. consented that the plaintiff in this case should receive the goods shipped, upon the execution of his notes at nine and twelve months, payable at the house of Ennis & Co., in Houston, bearing interest at seven per cent., and without stipulation for exchange, there was no contract of sale of the goods, and the owners or their agents had the right to resume the possession of the goods, or to withhold delivery of them until an arrangement satisfactory to the owner of the goods was made.

If the shipment of the goods by Messrs. Whitney, Fenns, Shaw & Co. was procured by any misstatement, or false or fraudulent representation of the plaintiff in relation to his ability to pay, then there was no valid contract of sale, and the owner of the goods or their agents had a right to withhold delivery of them, and are not responsible in damages for doing so.

If there was a consent on part of the shippers of the goods, to receive the notes of the plaintiff, in the manner the notes were executed in payment for the goods, and if there was no misrepresentation by the plaintiff of his ability, then the property in the goods was rested in the plaintiff when they were put on ship board, and the bills of lading were signed. But in the latter case, the shippers of the goods still had the right to stop them in their transit, in the event of the insolvency of the buyer.

In relation to the insolvency of the buyer, which authorizes the vendor of goods to stop them in their transit, the rule of

law is, that any well grounded or probable information of such an embarrassment, on the part of the buyer, as to prevent him from honoring his drafts or meeting the demands of his credi· tors, is a sufficient insolvency to justify the vendor in stopping the goods. If the vendor of the goods stops them in their transit, through excess of caution or from motives of prudence, or from misinformation of the insolvency of the buyer, with· out any intention on the part of the vendor to injure the buyer, the buyer would be entitled to claim the goods and all indemni· fication for all the expenses growing out of the stoppage; but he cannot in such case recover damages beyond this.

The plaintiff cannot recover the goods in this case, because he does not sue for them.

Plaintiff had requested instructions directly to the contrary of those given, as to the contract of sale; and others as to the right of stoppage *in transitu;* all of which were refused.

Verdict and judgment for defendants. Motion for new trial overruled, &c.

*F. Tate,* for appellant. The only question presented in this case is, did the facts as proven justify the defendants in stop· ping the goods of the plaintiff?

From all the authorities I have been able to examine, the right of stoppage *in transitu* depends upon two main points:

1st. The insolvency of the buyer.

2nd. The procurement of the purchase and sale by the fraud· ulent representations of the buyer.

In regard to the first point it is urged, &c. (Here counsel argued this point, and cited authorities.)

There can be no doubt but that the shipment of the goods and the remittance of the invoice and bill of lading to S. H. Summers & Co., and the remittance of the notes to Whitney, Fenns, Shaw & Co., vested the title to the goods in S. H. Summers & Co., subject only to the right of stoppage *in tran-*

*situ ;* and indeed this right is based upon the assumption that the title to the goods has passed to the vendee. (Walley v. Montgomery, 3 East, R. 585 ; Wilmshurst v. Bowker, 7 M. & Gr. 882, which is quoted with approbation in Smith on Contracts, pages 438 and 439 ; Abbott on Shipping, 659.)

In this case the evidence shows that S. H. Summers & Co., as soon as they recived the bill of lading and invoice, and were informed of the arrival of the goods, executed and remitted their notes in perfect accordance with the letter of Whitney, Fenns, Shaw & Co.; longer time was needed, and the interest after six months was added ; it was not agreeable for them to make their notes payable at Mills & Co., in Galveston, and therefore they were made payable at Houston, Texas ; and all this we contend was authorized by Whitney, Fenns, Shaw Co. in their letter.

A bare glance at the record will be sufficient to repel the idea of fraud on the part of S. H. Summers & Co. The letter of S. H. Summers & Co. contained references in Boston, and its statements were sustained by the evidence.

*J. T. Harcourt,* also, for appellant. The Judge *a quo* seems to have founded his charge upon Section 339 of Story on Sales. By a careful inspection of the entire Section, it is manifest that the Judge misapprehended the law. The Section makes a distinction between the strict right of stoppage *in transitu* and the right of the vendor to countermand the goods. For the exercise of the former right the vendee must be insolvent. The right to countermand upon information of embarrassment must depend upon the consent of the vendee ; a mutual agreement to rescind the contract. " But when goods are shipped to order, the consignor must hold to his agreement, and if he have given credit, or taken a note, or bill of exchange, for the price, he cannot take possession of the goods on their passage, and insist upon immediate payment, as the condition of delivering them. The consignee being willing

to pay according to the original terms of the agreement, and not being insolvent." (Sec. 329, Story on Sales.)

We are willing to stand by this law. The plaintiff was not insolvent, and although seriously injured by the stopping of his goods, has never stopped payment. · ·

The defendants justify upon the grounnd of the right of stoppage *in transitu*, as the agents of the vendors.

We think there are so many glaring errors in the record that a bare inspection will induce a reversal of the cause.

*Sherwood & Goddard*, for appellees. I. This is not a case of stoppage *in transitu* proper, for the reason that no contract of sale was ever made, by which the appellant acquired the property in the goods.

II. There was no mutual assent of the negotiating parties to any terms of sale.

The terms proposed by Whitney, Fenns, Shaw & Co., in their letter of July 29th, were never accepted by Summers; for his letter of September 9th, and the notes therein enclosed, modified the terms of the proposition, and therefore constituted a counter offer, which counter offer was rejected by Whitney, Fenns, Shaw & Co. That the acceptance must correspond exactly with the offer, in order to constitute a contract. (See 1 Parsons on Contracts, p. 399 *et seq.*; Story on Sales, Sec. 136; Story on Contracts, Sec. 387; Smith on Con., p. 92; Chitty on Con., p. 12, &c.)

III. The offer was not accepted, if at all, until after it had been withdrawn. (1 Parsons on Contracts, 406; 2 Kent, 477; Story on Contracts, Sec. 384 and 779; 9 Howard, 400; Story on Sales, Sec. 129.)

IV. If the offer was accepted, and that, too, before it had been withdrawn, still there was no contract for the reason that Whitney, Fenns, Shaw & Co. were induced to fill the order, and ship the goods, by Summers' fraudulent and deceptive representations. The letter containing the order was designed

and calculated to produce the belief that Summers & Co. were a firm of long standing, established respectability and considerable pecuniary means. The proof is, that they had commenced business in the previous summer on a small stock of goods, furnished by C. Ennis & Co., mostly on credit; that their pecuniary resources were exceedingly limited.; and that this must have been the very first order for Fall goods ever sent by them to any house, domestic or foreign. (2 Parsons on Contracts, 270 and references; Id. 451; Story on Sales, Sec. 176; Id. Sec. 165 *et seq*., and Sec. 172 *a*.)

The case is not altered by the fact that Jas. Ennis made similar misrepresentations, which also influenced Whitney, Fenns, Shaw & Co. to ship the goods. (Story on Sales, Sec. 155 *a*, and authorities already cited.)

V. It cannot be maintained that the contract of sale was perfected by the mere shipment of the goods, operating as a delivery; for first, a delivery fraudulently procured, (as this was,) vests no title; and secondly, the delivery in this case being, at most, but a conditional one—*i. e. :* designed to take effect only on the condition that Summers & Co. should accept and comply with the terms of sale, no right of property would vest in the appellant until this condition had been complied with. (See Story on Contracts, Sec. 803 and 804.)

If for any of the three reasons assigned, no contract of sale consummated between Whitney, Fenns, Shaw & Co. and Summers; then the former never parted with their right to the goods, and were at liberty to resume the possession of them, at any time or place, in person or by their agents, and the appellant has no right of action to recover damages for whatever loss he may have sustained in consequence of not being allowed to obtain the possession and disposition of Whitney, Fenns, Shaw & Co.'s property.

In this view of the case, it is unnecessary to consider the errors assigned, founded, as they all are, upon the assumption of a stoppage *in transitu*, technically so called. No erroneous

views which the Court below may have entertained on that subject, can occasion a reversal of this case. Still, it may be due to his Honor, the District Judge, to observe, that the charge especially questioned by the appellant's counsel is in the very language of Story, in Section 329 of his Treatise on Sales; (see also Hovenden on Frauds, 398 and 399.)

WHEELER, J. The defendants justified their detention of the goods on two grounds :

1st. That the contract of sale was not complete, and consequently the property in the goods did not vest in the plaintiff by the shipment of them.

2nd. That the sale was procured by the fraudulent representations of the plaintiff; and though complete, the vendors had the right to rescind it upon the discovery of the fraud, and reclaim the property. These were the grounds on which the defendants, in their answer, rested their defense, and it is upon one or both of them that the judgment must be maintained, if at all.

The effect of a consignment of goods generally, is to vest the property in the consignee. If the terms of the sale were agreed on by the parties, the shipment of the goods and delivery of the bill of lading undoubtedly transferred the property to the consignee, and the consignors retained only the right of stoppage *in transitu*. (2 Kent, 549; 1 Parsons on Con. 488; 2 Wash, C. C. R. 283; 8 How. R. 429; Parsons, Merc. L. 346.) But if the contract of sale was not complete, I apprehend the consignment and sending forward the bill of lading before the parties had agreed upon the terms of the sale, would not have the effect to transfer the property. There must be a contract of sale, to pass the property. And there is no contract unless the parties thereto assent; and they must assent to the same thing in the same sense. There was, in this case, a proposal to purchase and an acceptance of

the proposal, but the terms of the sale were not agreed on. In the proposal to purchase, nothing was said respecting terms; but the vendors having communicated their terms, and supposing they would be assented to, shipped the goods without waiting for the answer containing the vendee's acceptance of them.   The terms were never accepted, and there was, consequently, no contract of sale.   The terms proposed called for notes payable in six months at the office of R. & D. G. Mills, in Galveston, with exchange, and, if a further extension of time was required, that the notes should bear interest after six months.   The notes returned, in reply, were made payable in nine and twelve months at the office of C. Ennis & Co. in Houston, with interest at seven per cent. after six months, and without exchange.   This was not an acceptance of the terms proposed.   It does not matter that the difference of terms between the parties may not seem to be very material. If a diversity exists, that fact is enough.   To make a contract, there must be a mutual assent.   " The assent must comprehend the whole of the proposition ; it must be exactly equal to its extent and provisions, and it must not qualify them by any new matter."   If the answer, " either in words or effect, departs from the proposition, or varies the terms of the offer, or substitutes for the contract tendered one more satisfactory to the respondent," there is no assent and no contract.   (Parsons on Con. 400.)   " If a proposition be accompanied with certain conditions or limitations, the acceptance must correspond to it exactly, for if any alteration be suggested, or any exception be made to its exact terms, the provisional acceptance becomes merely a new proposition, which also requires an acceptance." (Story on Sales, Sec. 136.)   The Court cannot undertake to say how much consequence the consignors may have attached to the condition of making the notes payable at the office of their confidential agents at Galveston, or what objection they might have to their being made payable at the office of C. Ennis & Co., at Houston.   It is enough that they proposed the

one and not the other. They required the payment of inter-
est, after six months, if the time of payment was enlarged.
At the place where the notes were made and payable, interest,
without more, meant eight per cent. per annum; and this
must be taken to be the interest proposed. They were not
bound to accept notes drawing seven per cent. However ap-
parently important the variations in the terms proposed may
have been, they amounted to a new proposition, which re-
quired acceptances, and which was not accepted. The con-
tract of sale therefore was not consummated, and there con-
sequently was no transfer of the property. It is wholly im-
material whether the consignors declined to accept because of
the variation in the terms they had proposed, or because they
had been informed of the imposition which had evidently been
practiced upon them, as to the means and ability of the pur-
chaser. Their assent was necessary to the completion of
the contract; without it there was no contract, from what-
ever cause it may have been withheld. They were at liberty
to recede at any time before the acceptance of their proposi-
tion; and having done so, they had the right to resume the
possession of their property. The exercise of that right was
not, as the argument for the appellant assumes, that of a stop-
page *in transitu.* That is a right which subsists where there
has been a contract of sale, which transfers the property to
the consignee; this was merely the resuming of the posses-
sion, which had been parted with, while the parties were nego-
tiating the terms of the sale, but which was not accompanied
by a transfer of the property, because of the failure to agree
upon terms. In the one case there is the enforcement of a
right, in the nature, it is said, of a lien, which subsists after
the title has vested in the purchaser; in the other it was but
the act of taking possession by the owners of their property.

The present is distinguishable from the case of Wilmshurst
v. Bowker, (7 M. & Gr. 882, 49 E. C. L. R.,) in this: there
was a contract of sale in that case, which specified the terms

and manner of payment ; it was to be " by banker's draft on London at two month's date, to be remitted on receipt of invoice and bill of lading." The wheat was put on board of a general ship, under a bill of lading, by which it was made deliverable " to order or assigns, he or they paying freight," &c. The defendants sent the plaintiffs the bill of lading, indorsed generally, and an invoice, stating the wheat to be shipped by order and for the account and risk of the plaintiffs. Upon the receipt of the invoice and bill of lading, the plaintiffs, instead of a banker's draft on London, transmitted to the defendants their own acceptance for the invoice price of the wheat and the cost of the insurance, which the defendants immediately returned, informing the plaintiffs that such acceptance was contrary to agreement, and that they had arranged otherwise for the disposal of the cargo, which they obtained back from the captain of the vessel and resold. The question upon these facts was, whether the property in the wheat had passed to the plaintiffs under the contract. And the Court of Common Pleas held that it had ; but that the intention of the parties, under the contract was, that the consignor should retain the power of withholding the actual delivery of the wheat, in case the consignees failed in remitting the banker's draft, on the receipt of the bill of lading. " When goods are sold, (the Court said,) and nothing is said about the time of delivery and the time of payment, the seller is bound to deliver them whenever they are demanded on payment of the price. But the buyer, as is observed by Mr. Justice Bayley, in Bloxam v. Sanders, 4 B. & C. 948, has no right to have the possession of the goods until he pays the price. In the present case it is part of the stipulation that something shall be done by the buyer before the time when, in the usual course of business, the goods can be actually delivered ; namely, upon the handing over of the bill of lading to the buyers, which ordinarily precedes the arrival of the ship ; so that the right to

the possession of the goods could not vest until the buyer either remitted, or tendered, or offered to remit, the banker's draft in payment." These principles were sanctioned by the Court of Exchequer Chamber ; but the judgment was reversed on the ground that there was a complete contract of sale on credit, which passed the property to the buyer, and the payment stipulated for was not a condition precedent to the delivery of the goods. Lord Abinger, C. J., said, " We accede to the general principle laid down by the Court below, and if the facts had been before a jury, we are not prepared to say that they might not have drawn the inference that the remitting of a banker's draft was a condition precedent to the vesting of the property in the wheat in the plaintiffs. But we draw no such inference from what appears upon the record. The delivery of the bill of lading, and the remitting of the banker's draft, could not be simultaneous acts ; the plaintiffs must have received the bill of lading and invoice before they could send the draft. The default on the part of the plaintiffs amounts to no more than this, that they have omitted to perform one part of their contract." (7 M. & Gr. 891, E. C. L. R.) The case, as observed by Mr. Smith, (Smith on Con. 440,) falls within the rules applicable to the ordinary one of a vendor who having sold on credit has not been paid. The contract of sale was complete ; the property had passed ; and the payment was a condition subsequent and not a condition precedent. And so it would have been in this case, if the contract of sale had been complete : the terms, that is, the time and manner of the payment agreed on between the parties before the goods were shipped, as in that case. Then, undoubtedly, the failure of the buyer to comply with the stipulated terms of payment would have been a breach of contract, for which an action would lie. But the terms of the sale had not been agreed on by the parties, and until that was done there was no contract, and consequently could be no breach by the failure of the vendee to comply with the terms proposed by

the seller. The buyer was not obliged to accept the terms proposed; and it is of the very essence of a contract, that the obligation must be mutual, in order to be binding.

It was for the Court to construe the writings relied on as constituting the evidence of a contract ; and it would not have been improper for the Court to have instructed the jury that there was not such a contract as passed the title to the property, and consequently the plaintiff could not maintain the action.

This view of the law arising upon the plaintiffs' evidence, would lead to an affirmance of the judgment, on the ground that he had not acquired a property in the goods, and consequently had no right of action against the defendants, for the detention of them  But if we were in error as it respects our construction of the contract, and suppose the judgment to rest upon the other ground, that the contract was void for fraud practiced in procuring the sale, the result must be the same. It cannot be doubted that the jury were well warranted in the belief that the consignors were deceived and induced to make the consignment by the false impression produced by the plaintiffs' letter and the representation made, as to the ability and standing of the plaintiff's house. The letter was well calculated to make, and doubtless did make, a false impression upon their minds ; and it can make no difference, that the impression was confirmed by the representations of another. The effect was. a deception, produced in part, at least, by the plaintiff, and for which he is responsible. The evidence places it beyond doubt, that if the consignors had been truly advised of the pecuniary ability of the plaintiff, and his business and standing as a merchant, they would not have made the consignment. But they acted under a deception produced in part, at least, by the plaintiff's letter ; and the jury, therefore, were well warranted in finding that the contract, if complete in terms, was void on the ground of fraud. Upon either ground,

---
---

therefore, upon which the defendants rested their defence, the verdict and judgment were rightly rendered.

There was no question of a right of stoppage *in transitu* raised by the pleadings ; no such question was in issue before the jury, and the Court therefore might very properly have declined to give any instructions upon that subject. The instruction given was not erroneous ; (Parson's Mercantile Law, 60–61 ; Story on Sales, Sec. 329 ;) and although abstract, can not have misled the jury. The judgment is affirmed.

Judgment affirmed.