# SUPREME COURT OF TEXAS.

## AUSTIN TERM, 1881.

### W. J. BRYAN v. W. E. CRUMP.[1]

(Case No. 134.)

1. TRESPASS TO TRY TITLE — LOCATION ON TITLED LAND.— A judgment of the district court, affirmed on appeal by the supreme court in 1848, in a proceeding by the legal representatives of a colonial empresario, against the president of the republic of Texas and commissioner of the general land office, divesting out of the state all title to a tract of land in Austin's colony and vesting it in the estate of the empresario, constituted the land "titled" land within the meaning of the act of February 5, 1850, to prevent locations in the colonies of Austin, DeWitt and DeLeon, without reference to the formality of the issuance of patent.

2. SAME — COLOR OF TITLE.— The location on land thus titled, after February 5, 1850, and the issuance of patent on such location, were null and void, nor could such patent and the mesne conveyances thereunder constitute color of title from and under the sovereignty of the soil.

3. SAME — INNOCENT PURCHASER.— One cannot acquire title by purchase to land thus claimed under patent issued in violation of law, as an innocent purchaser. As a purchaser, he is chargeable with notice of the recitals in the deed and patent under which he claims, and these would inform him that the land was located and patented after February 5, 1850, in a colony where locations after that date were prohibited.

---

[1] This case and the six following, it will be seen from the date when the opinions therein were delivered, were not of the Austin Term, 1881. Their omission from former volumes was caused by the fact that the records were not accessible when they should have been reported.

APPEAL from Austin. Tried below before the Hon. Livingston Lindsay.

Suit by Bryan, appellant, to try title to a labor of land in Austin county, on the west side of the Brazos river, above the town of San Felipe, and commonly known as labor No. 4, the same being above the mouth of Mill creek, about nine and one-half miles southeast of Belleville. The land was particularly described by metes and bounds, and the suit was filed on the 29th day of March, 1873. The defendant answered by a plea of "not guilty," and the plea of the statute of limitations of three years. The facts were agreed upon by the parties, as follows: That the plaintiff claimed the land in controversy as one of the heirs at law of Emily M. Perry, and that she was a sister, and one of the principal devisees of the last will of Stephen F. Austin, and that she derived title to the land as such devisee from said Austin's estate.

2. That Stephen F. Austin died in Brazoria county, Texas, a short time prior to the 21st of March, 1837, leaving a will, which nominated his brother-in-law, James F. Perry, as his executor.

That on the 21st day of March, 1837, said James F. Perry caused said will to be duly probated in the probate court of Brazoria county, Texas, and became the executor thereof.

3. That on the 8th day of February, 1838, said James F. Perry, as executor of Austin's estate, filed a suit in the district court of Harrisburg county, Texas, against Sam Houston, as the president of the republic of Texas, to establish a claim against the republic of Texas for premium lands due said Stephen F. Austin at the time of his decease as empresario, upon colonization contracts made and entered into by said Austin with the government of the state of Coahuila and Texas, and setting forth that Austin, in his life time, had selected certain lands in part satisfaction of his claim, among which lands so selected

was the labor No. 4, upon the west side of the Brazos river, above the town of San Felipe, in Austin county, it being the land in controversy. That in said suit there was a prayer that the title to the lands selected be confirmed in the estate of Austin, and also a prayer for an injunction against the defendant, Sam Houston, and a further injunction against John P. Borden, the then commissioner of the general land office, prohibiting and restraining them from making title to other parties to any of the lands selected as premium lands by Austin, and also a further injunction against the county surveyors of the different counties where the land so selected was situated, from entering upon, surveying, or in any manner interfering with, said lands.

. This injunction was granted, and on the 13th day of February, 1838, a writ of injunction was issued against Sam Houston, president, and John P. Borden, commissioner of the general land office, enjoining them not to issue or grant titles to any of the lands selected and named in the petition, among which was said labor No. 4 in controversy in this suit.

This writ of injunction was executed on the 20th day of February, 1838, by the sheriff of Harrisburg county.

4. That on the 8th day of May, 1840, this suit was transferred to the district court of Travis county, Texas, on account of the change of the seat of government to that county, and on the 13th of October, 1846, judgment was rendered in that court upon said cause, in favor of the plaintiff Perry, establishing the title in Austin's estate to all the lands selected and set forth in the petition, including said labor No. 4 in controversy in this suit, and divesting all the right and title of the state of Texas in and to said lands, and vesting the same in the heirs and representatives of Stephen F. Austin, deceased, and perpetuating the injunction theretofore granted, restrain-. ing all persons from entering or surveying any of said

lands, and the commissioner of the general land office from issuing patents on the same.

5. That said cause was appealed to the supreme court, the same being the case of Sam Houston, President, Appellant, *v.* James F. Perry, Executor of Stephen F. Austin, Appellee, being No. 445 on the docket of the supreme court. That on the 10th day of April, 1848, the supreme court finally decided that cause, affirming the judgment of the district court so far as the same pertained to labor No. 4 involved in this suit, and also affirming as to a portion of the other lands set forth in the district court judgment, perpetuating the injunction granted by the court below, and also by decree divesting all the title of the state of Texas in said lands mentioned, including said labor No. 4, and vesting the same in the appellee, as executor of Stephen F. Austin, deceased, which said cause is reported in 2d Texas Reports, pp. 37 *et seq.*, entitled Houston *v.* Perry, Ex'r of Austin.

6. It is further agreed that Joel Bryant, the plaintiff in this suit, holds the land in controversy by regular line of descent, cast upon him from the estate of Stephen F. Austin, deceased, by virtue of heirship and partition of said estate.

7. It is further agreed that defendant holds and claims said land by a regular chain of title and mesne conveyances from and under a patent, issued by the state of Texas for the land in controversy to the heirs of Patrick Magee, deceased, issued on the 15th day of October, A. D. 1851, by virtue of conditional certificate No. 141, issued by the board of land commissioners of Harrisburg county, on the 16th day of March, A. D. 1853; upon which, unconditional certificate No. 564 was issued by the board of Harris county on the 5th day of January, A. D. 1846.

8. It is further conceded that the survey, by virtue of which said patent issued, was made on the 11th and 12th

days of July, A. D. 1851, by D. Charles C. Amthor, the then district surveyor of Austin county, and duly certified to by him on the 14th day of July, A. D. 1851.

9. It is further conceded that the defendant William E. Crump purchased the land in controversy on the 17th day of December, A. D. 1859, in good faith and for a full and adequate valuable consideration, paid at the time of purchase, and without notice of plaintiff's claim, unless the case of Perry, Ex'r, v. Sam Houston, President, above referred to, and the proceedings thereunder, be considered notice.

10. It is further conceded that the defendant, at the time of his purchase, was the owner of a plantation adjoining the land in controversy, and that immediately after his purchase he began to exercise acts of ownership openly and notoriously, by cutting rails, wood and timber from off the land in controversy, for the use of the plantation adjoining, and claimed the same as his own property, openly and notoriously; that none of said land has been in cultivation or under fence; that no house or other buildings were placed upon said land until the fall or winter of 1866 and 1867, nor were there any other acts of possession by Crump, or those under whom he holds, prior to that time, except the cutting of wood, timber and rails, as above stated.

11. It is further conceded that the defendant has regularly paid the taxes on the land, and that this suit was filed on the 29th day of March, A. D. 1873.

The court charged the jury substantially as follows, to wit: That the better title to the labor No. 4 in controversy is in the plaintiff, and, in a simple contest upon mere title, the plaintiff would be bound to succeed; but if the jury believe from the evidence that Wm. E. Crump was a purchaser in good faith, for a valuable consideration, without notice of the superior title in equity of the plaintiff, and that he took possession of the land by any

public, visible act, manifesting to the world that he held the same adversely, such as the building of a house, the cutting and using of timber, etc., and has continued such adverse claim and possession for more than three years before the commencement of this suit, with a regular chain of transfer from or under the sovereignty of the soil down to himself, he is protected by the statute of limitation, and the plaintiff cannot recover.

The decision of the supreme court in the case of Stephen F. Austin, Executor, v. Sam Houston, the president of the republic, settled the paramount right of S. F. Austin's estate to claim the specific land set out in that decision. But to guard and protect such paramount right against subsequent innocent purchasers for a valuable consideration without notice, the claimants under Stephen F. Austin were guilty of laches or negligence in not presenting the judgment of the court to the president and commissioner of the republic, and demanding a patent or the legal title, so as to shield all innocent purchasers without notice, and thus enabling the commissioner of the land office, by such notification, to refrain from issuing other patents for the same land to other persons.

Such presentation of the judgment to the commissioner of the land office, and the issuance of the patent thereupon, would have been notice to all the world, because that office was the fountain of all the land titles of the state.

Verdict and judgment for the defendant.

Motion for new trial on the following grounds, viz.: Because the court erred in the charge to the jury; and because the verdict was contrary to the law and evidence. Motion overruled.

The appellant assigned the following grounds of error, viz.:

1. The court erred in the charge to the jury upon the question of the statute of limitations.

2. The court erred in denouncing the plaintiff and those under whom he claims as guilty of laches or negligence.

3. The court erred in overruling plaintiff's motion for a new trial, based upon the ground of errors in the charge of the court, and the additional ground that the verdict was contrary to the law and evidence of the case.

*A. Chesley,* for appellant.[1]

WALKER, COMMISSIONER. — On February 5, 1850, it was enacted by a statute entitled " An act to prevent locations in the colonies of Austin, DeWitt and DeLeon," as follows: "That no certificate of land, land warrant, or evidence of land claim, of any kind whatever, shall hereafter be located upon any land heretofore titled or surveyed within the limits of the colonies of Austin, DeWitt and DeLeon; and the commissioner of the general land office is hereby prohibited from hereafter issuing a patent on any location hereafter made for any of the lands described in this act; and should any patent be hereafter issued for the same, or a part thereof, contrary to the provisions of this act, the same shall be null and void."

The agreed facts show that this labor of land, here in controversy, had been selected by Stephen F. Austin during his life-time, long before the enactment of the foregoing statute; that it was thus selected by him as a part of his premium lands, as empresario of Austin's colony, and known as his labor of land No. 4, situated above the town of San Felipe, on the west side of the Brazos.

It appears by a reference to the case of Houston *v.* Perry, referred to in the statement of facts and in the charge of the court, as it is reported on page 56, 2d Texas Reports, that the field notes of the survey of the land in question were embodied in the petition of the executor of

[1] A brief is on file for appellee with no attorney's name signed thereto.

Stephen F. Austin, in the suit referred to, and which the judgment of the supreme court expressly embraced in the decree which it made. It is admitted in the statement of facts, which admission corresponds with the decree, as shown in the opinion of the supreme court, that all the title of the state of Texas to said land was decreed to be thereby divested out of said state, and vested in the estate of Stephen F. Austin, deceased.

When this decree was made, the labor of land in controversy was not only "*surveyed*" land within the meaning of the act of 1850, but it was *titled* land, as meant and intended by that law. The republic of Texas had the undoubted right, by the exercise of its legislative will, to divest its title to any part of the public domain in any mode it saw proper, unless restricted by some constitutional provision. It saw proper to confer upon the district courts jurisdiction to settle the claims of empresarios to land under their contracts with the former government, by entertaining suits for that purpose, to be instituted against the republic of Texas, with authority to try the same "as all other land suits are tried." See secs. 26 and 27 of an act relating to the establishment of a general land office, passed December 14, 1837, page 71, vol. 2, Laws of Republic.

The supreme court has conclusively construed the extent of the jurisdiction which was conferred by the above law, both in cases where the adjudication to be made under it involved the claim of the empresario to have his claims and rights to lands settled and confirmed, which had been deeded to him as such, and his rights adjusted by decree, confirming the title to so much thereof as might be determined to belong to him under such contracts, as in Houston *v.* Robertson, 2 Tex., 1, and in cases where suit was brought, as in Houston *v.* Perry, 2 Tex., 37, to have decreed to the empresario the *title* to land which had been *selected* under the former government,

but had *not* been granted or titled.   As has been seen in
the case last cited, the supreme court formally and dis-
tinctly decreed the *title* itself to be vested in the plaintiff
to the land, and in very terms "divested all the title of
the state of Texas to the said land."   The decree thus
made was not the mere adjudication of the plaintiff's
inchoate right to said land, or to land generally, which
might be selected out from the public domain, and there-
fore the mere evidence of right or a claim to land; it was
more; it was title itself to the land; it was the highest
and best title which could be given to a citizen; it was the
grant made by the sovereign power of the state, made in
the mode designated by law of the specific land.   It was
not the less a grant consummate and perfect in every re-
spect, because not made in the other modes provided by
law for the issuance of titles from the government to
other citizens, as provided in the general land policy of the
country.   In Herndon *v.* Robertson, 15 Tex., 593, in pass-
ing upon the jurisdiction of the district court to deter-
mine and decree the *title* of empresarios to specific lands,
making reference in the opinion delivered to the case of
Houston *v.* Robertson, Justice Wheeler used this lan-
guage: " The identical land now claimed by the appellant
(Herndon), by locations made since the commencement
of this suit, was claimed and sought to be recovered of
the government by the plaintiff (Robertson) in the suit.
Can it be doubted that the court had the power to adjudge
it to him; or that the judgment would be binding upon
one who purchased from the defendant during the pend-
ency of the suit?"   Thus, it is apparent that the courts
have, consistently, from the earliest period, maintained
the construction of the 26th and 27th sections of the land
law, to fully warrant the district court to decree *title* from
the government to empresarios, in suits brought under
them, as was done in the case of Houston *v.* Perry, re-
ferred to in the charge of the court.   See also Summers

*v.* Davis, 49 Tex., 549; Trueheart *v.* Babcock, 51 Tex., 163; Westrope *v.* Chambers, 51 Tex., 178, for a discussion and construction given by the supreme court to the act of February 5, 1850, and as to the character of titles in Austin's colony, embraced within the meaning, and which are under the protection of the act referred to; showing that defective and even void grants may be within the favor of the law.

If, therefore, the land in question was situated within the limits of the colonies of Austin, DeWitt or DeLeon, the location upon it, after the 5th day of February, 1850, of any evidence of land claim, of any kind whatever, the patent issued by the commissioner of the land office for the same, by virtue of such location, would be, under the act of 1850, null and void.

That it was located within Austin's colony, the court judicially takes cognizance of from the facts agreed upon as to the *locus* of the land; it is situate in Austin county, the boundaries whereof are defined by law. The limits and boundaries of Austin colony were alike defined by the political power of Coahuila and Texas. See Executive Decree No. 24, White's New Recopilacion, p. 613, in which the boundaries of the colony are established; within the limits of which colony the county of Austin was embraced.

The boundaries of counties, as municipal subdivisions, are matters of judicial knowledge. State *v.* Jordan, 12 Tex., 205.

"The fact that a particular section of country was comprehended within the limits of the colony contract of Austin and Williams, until the rights of Robertson were established by the decree of the 29th of April, 1834," it was held in Robertson *v.* Teal, 9 Tex., 344, "is public and notorious. It is a matter belonging to the public history of the times. It exists, or should exist, for perpetuation, among the public archives. It was involved in

the litigation prosecuted against the government, by the empresarios of what is generally known as Robertson's colony, and of the colony of Austin and Williams, and it, as a fact, is as much entitled to judicial recognition as any other matter on the records of history."

In Williams v. Simpson, 16 Tex., 434, the court took judicial notice of the fact that the contract of Vehlein was extended for three years by decree No. 192 (Laws of Coahuila and Texas, p. 195), from the 21st day of December, 1832, and it was remarked in the opinion, that this was a fact in the public history of the country, published *among* its laws, which the court was bound to notice, without averment or proof. These decrees, it will be noticed, are to be distinguished from the general laws of Coahuila and Texas; which discrimination was observed by the court in its opinion, which treats them as matters of public history. See, also, 1 Greenl. Ev., sec. 6.

It being thus made to appear from the evidence, that the title under which the appellee claimed was a survey made in July, 1851, and a patent issued in October, 1851, and that the land was the identical land which had been surveyed and titled within the colony of Austin, to the executor of Stephen F. Austin, under whom the appellant derives title, it follows, as a consequence, that under the plain denunciation of the law of February 5, 1850, the location and patent were both absolutely null and void. Such mere semblance of title being a nullity, it cannot, together with the mesne conveyances down from the government to the appellee, constitute color of title from and under the sovereignty of the soil; it would be, rather, a mere seeming consecutive chain of title up to the sovereignty which had denounced its very origin as null and void. A void grant is not a title, or color of title, under which a possession of three years will bar an action by the true owner. See Smith v. Power, 23 Tex., 29; Marsh v. Weir, 21 Tex., 97. And so, it would seem,

that the title under which Crump claims is not such as would support the plea of the three years' statute of limitations. It is not necessary, however, that we should determine that question, because three years had not elapsed between the date when the suspension of the operation of all statutes of limitation was removed, viz., the 30th day of March, 1870, and the date of filing this suit, which was the 29th day of March, 1873.

Whatever rights the appellee may insist upon, under the facts of this case, must be such, if any he has, to which he may be entitled as an innocent purchaser, for value paid in good faith, without notice, actual or constructive, of the appellant's title. We are of the opinion that he could acquire no valid title to the land under the doctrine which courts of equity apply ordinarily to such innocent purchasers; and besides, he being chargeable, as a subsequent purchaser, with the knowledge of the recitals of his deeds and the patent through which he claims, and therefore with the knowledge of the locality of the land, he is bound thereby, and is held to have had notice of the facts recited in them which indicated where the land was situated. Peters v. Clements, 46 Tex., 123; Jackson v. Elliott, 49 Tex., 68.

When Crump acquired a deed from his vendor, without notice, in good faith and for value, he obtained no title from the state of Texas; he obtained no more than his vendor himself possessed; for the government had by law repudiated as null and void all acts of its officers or others who had been instrumental in simulating by forms its conveyance by patent, the land which it had before that time already conveyed by a decree of its court to another party, and which, with all other lands which had been previously surveyed or titled within the colony where it was situated, it had withdrawn from any appropriation whatever by the holders of claims for land against the state. As between two vendors of land from the

same grantor, acquiring from him deeds at different times, the first will not take under his deed, if he has failed to give actual or constructive notice of his title and claim, as against the second, who has purchased *bona fide* for value, and without notice. The law of the land exacts from him, for the protection of third parties, that he shall give such notice to entitle him to the advantage of his purchase. But in that case the law declares the rule which has been stated, and it affixes, in effect, the condition which has been stated, upon the contract. But where the law, in a given state of case, declares the reverse rule, viz., that the second sale by the grantor shall be absolutely null and void, the consequence must ensue, that, unlike the case first supposed, the title of the grantor is by the express terms of the law exhausted by his first conveyance, and the good faith and ignorance and payment of a valuable consideration by the subsequent vendee, cannot affect the title of the first. The prior vendee must hold, because, in fact, the grantor has not, indeed, made a conveyance to the subsequent vendee which the law of the land permits to be recognized as a conveyance; but, to the reverse, denounces as absolutely void. The doctrine itself which protects the innocent purchaser, is one founded on equity; but equity does not contravene, but "follows the law." And in doing so it cannot give effect to a title which the law denounces as one which was acquired directly against positive statutory inhibition; and which, even when clothed with all the habiliments of seeming validity, it nevertheless denounces as utterly null and void.

Thus, it seems that such a title can no more shield its possessor under the equitable doctrine which is applied to innocent purchasers for value without notice, than it could be made available as a defensive plea under the three years' statute of limitations.

In the one class of cases, the equity rule of the com-

mon law, the statute of conveyances of real estate, and concerning the registration of deeds, unite to give effect to the second conveyance made by the grantor; but in the other, where the law declares the second conveyance (location and patent) is null and void, an opposite result must be the consequence — no effect can be given to it. The supposed title is purely an imaginary one; the grant of the land is an impossible one in contemplation of law. Long continued possession of land will, after great lapse of time, raise the presumption that it has been granted by the government, although the evidence thereof may be lost. But this acknowledged rule of property has no application where, under the law, the grant by the government of that particular land was forbidden to be made by the law. In the case of Goodlittle, Dem. of Parker, v. Baldwin, 11 East, 488, the doctrine was recognized that a possession of crown lands for fifty-five years would authorize a presumption of a grant from the crown. But as the statute forbade all grants of the forest of Dean, of which the land in controversy was a part, the presumption did not arise, because that the statute forbade the presumption of a valid grant. Lewis v. San Antonio, 7 Tex., 304.

If the application of the equitable doctrine which affords protection to an innocent purchaser can be so applied to the facts of this case as to vest the title in the appellee, it would be difficult to harmonize the repugnant elements which must be combined, in order to evolve the paradox that a title null and void, and which has come into existence both against the express denunciation of nullity, and a distinctly defined public policy, exempting surveyed or titled colony lands from location and patent by holders of land claims, shall prevail over the older and perfect title. The anomaly appears all the more striking, when it would result in the frustration of a public policy, the aim of which was to prevent the confusion, doubt

and uncertainty which would attend such conflicting locations, if permitted to be made within those colonies. The history of Texas suggests, too, that, besides this general policy, the sovereign will was moved to its expression no less by the patriotic reverence entertained for, and the grateful appreciation felt, of the services rendered, and the sacrifices made by the early colonists in behalf of Texas; and a consequent determination by her people to shield their titles to land from vexatious controversy and harassing doubts.

Under this view, if it be a correct one, it is not necessary to consider the facts as to whether the appellee was, in contemplation of law, an innocent purchaser, without notice and for value; it is agreed in the statement of facts that he was such innocent purchaser. But if, as a matter of law, he was chargeable with the recitals in his claim of title (Peters *v.* Clements, *supra*), and that title showed that the land was located and patented after February 5, 1850, in Austin's colony, he could not, being bound to take notice of the laws of the land, be an innocent purchaser. He would be held to know that the title he had purchased was void. If the recitals in his line of title failed to show those facts, he would nevertheless be chargeable with the knowledge as to where the land was situated, and that the patent was issued in 1850.

These facts are of a nature which point unerringly to the authentic source of all the other facts essential to be ascertained in order to apprise him, by making inquiry, of the validity or invalidity of his title, viz., the general land office; where he would find evidence of the location, survey and dates thereof, which, with his knowledge of the locality of the land, would have led inevitably to the knowledge of all other requisite facts. This amounts to notice; for whatever puts a party upon an inquiry, amounts, in judgment of law, to notice, provided the inquiry becomes a duty, as in the case of purchasers and

creditors, and would lead to the knowledge of the requisite fact, by the exercise of ordinary diligence and understanding. 4 Kent, 179; Sugd. on Vend., ch. 23; 1 Story's Eq., § 399, and notes; Wetherred *v.* Boone, 17 Tex., 150; Same *v.* Same, 23 Tex., 676.

But little more need be expressed by us concerning the merits of this appeal:

The law, as given to the jury in the charge, required them to find in favor of the defenses relied on, viz., that of innocent purchasers without notice, for value, and the statute of limitations of three years, if they found for him at all. The defenses are distinct, and should have been presented in the charge separately in their proper relations to the subject under the evidence. On this account, however, it does not appear that the appellant complains, nor that he was injured thereby. It imposed upon the appellee, indeed, a greater burden than was warranted, to require both defenses to be supported by satisfactory evidence before he was entitled to recover on either. The discussion which we have given of the whole subject in this opinion renders it unnecessary to make special reference further to the charge of the court. The charge assumed the validity of the appellee's title under the facts of the case, and charged the jury directly that the appellant's title, as against that of the appellee, was invalid, if the latter was a purchaser in good faith, for value, and without notice. In that view, we are of opinion that the court erred, and that the judgment ought to be reversed and the cause remanded.

REVERSED AND REMANDED.

[Opinion delivered March 15, 1881.]