## J. W. HOWELL v. E. G. HANRICK.
### No. 169.

1. **Spanish Grant—Erasures and Interlineations.**
    The penalty of nullity did not attach to erasures and interlineations appearing in a Spanish grant for land in Texas made in 1833, except where the same were not noted at the foot of the instrument before it was signed by the officer.    Where this was done, the instrument was valid ............. 392
2. **Construction of Grant.**
    The title in evidence showed the concession to Aguirre, also the application for survey, the permission to locate, and the field notes; the protocol reciting, that the grant is made in pursuance of the concession.    This showed title in Aguirre, although in the final title it is stated, that "possession is given and title conferred upon Valdez."    The mistake is evident, and does not vitiate the title of Aguirre .... .................................. 393
3. **Withdrawal of Evidence by the Charge.**
    The withdrawal or limiting of the effect to be given to immaterial evidence which might properly have been excluded from the jury, is no grounds for complaint.    It is not charging upon the weight of evidence.  See example. 393
4. **Burden of Proof—Ancient Instrument.**
    The title paper produced in evidence by plaintiff was a certified copy of the original, an archive in the Land Office—an ancient instrument.  It was attacked for forgery.  The paper being competent without proof of execution, as a copy from the Land Office, the burden of proving forgery was upon the defendant, and it was not error to so charge the jury.................... 394
5. **Power of Alcalde Under Special Concession.**
    In the concession to Aguirre, the alcalde is directed to have the eleven leagues of land surveyed, to put him in possession of it, and to give him the evidence of his right.    These duties were purely ministerial.  His power was clearly defined in the documents issued by the Governor, without which he had no authority whatever.  It was a special power authorizing him to perform a single act, with reference to one grant of land, to be extended to a specified person ................................................. 395
6. **Exhausted Concession—Void Grant.**
    If, as contended by plaintiff in error, the alcalde, on October 4, 1833, extended a title to Aguirre for eleven leagues, such grant exhausted the concession,

and the subsequent grant, on October 22, 1833, under which the defendant in error claims, was absolutely void as to all persons..................... 398

ON APPLICATION FOR REHEARING.

7. **Questions Raised on Writ of Error.**
    Where a question was discussed and decided by the Court of Civil Appeals upon assignments of error made, and where such decision is specifically alleged as error in the application for writ of error, it can not be held that the issue is not before this court ........................................ 411

8. **Power of Alcalde.**
    Able counsel have not presented to us any authority for the position that the alcalde, as such, ever had any authority, under the laws of Coahuila and Texas, to grant a second title upon a concession. His authority was exhausted in extending the first title ............................................. 411, 412

9. **Pre-emption—Land Certificates—Constitution.**
    Howell's survey was made May 4, 1876. At that date there was no law which prohibited the acquisition of this land under the Act of May, 1873 (by pre-emption). Article 14, section 2, of the Constitution, determining upon what lands the land certificates could be located, did not affect the acquisition of land under homestead donations or pre-emption rights ........... 412

10. **Public and Unappropriated Land.**
    If the grant by the alcalde was a second grant upon the same concession, it was wholly unauthorized, and did not in any way appropriate the land or confer any right thereto; and in that event the land was public and unappropriated public domain, subject to appropriation by plaintiff in error at the time his survey was made....................................... 413

ERROR to Court of Civil Appeals for Third District, in an appeal from Travis County.

The Court of Civil Appeals consisted of Judge Collard and Special Judges L. H. Brown and L. J. Storey, appointed instead of Chief Justice Fisher and Justice Key, who were disqualified.

Action of trespass to try title by Hanrick, claiming under an alleged grant for ten leagues of land, of date October 22, 1833, made by L. Lesassier, alcalde, etc., to Rafael de Aguirre. The defendant claimed under pre-emption claims, surveyed May 4, 1876. Suit was brought in Williamson County, and venue was changed to Travis County. Judgment for plaintiff approved by the Court of Appeals. Writ of error on application of defendant.

This Aguirre title was the subject of discussion in Hanrick v. Kavanaugh, 60 Texas, 1, and Hanrick v. Dodd, 62 Texas, 75. The reports of these cases, with the opinion, give the facts.

The errors complained of by the plaintiff in error are succinctly set forth by Justice Brown in his statement of the case in the opinion.

*Terrell & Walker, A. S. Fisher,* and *Thos. E. Snead,* for plaintiff in error.—1. Grants must be construed and interpreted with a view to the law of the time and place of their execution, which enters into, controls, and limits the grant; and when such law requires or prohibits the execution of the granting instrument in a particular way

under the penalty of nullity of the grant, and such vice is apparent from the face of the instrument, it is void, and confers no right. Ley III, title 18, part 3; Ley I, title 23, lib. 10, Nov. Rec. —; Escriche, Diccionario de Legislacion, p. 888; Ley I, title 6, part 7, and Ley I, title 7, part 7; Escriche, Diccionario de Legislacion, p. 671; Leyes 2, 3, 4, 7, 8, 9, title 7, part 7; Escriche, Diccionario de Legislacion, p. 894.

2. For an ancient instrument to prove itself, even at common law, by its antiquity, it must appear on its face to be genuine and free from suspicion. The most favorable rule ever announced for one claiming under such a deed is, that when there are erasures and interlineations on the face of the deed, it becomes a question of fact for the jury whether they were made before or after its execution, with no presumption as to the time when they were done, if the interlineations are in favor of the grantees or those claiming benefit under them; while the doctrine best sustained by authority is, that he who propounds a deed suspicious from changes apparent on its face, must show when they were made. Stooksbury v. Swan, 85 Texas, 563; Hill v. Nisbett, 58 Ga., 589; Walter v. Short, 5 Gill, 252; Wilson v. Henderson, 9 S. & M., 375; Barnham v. Ayer, 35 N. H., 351; Maybee v. Sniffin, 2 E. J. Smith (N. Y.), 1.

And even if over thirty years old, the suspicious alterations must be explained: 1 How., 104; Cowen & Hill's Notes on 4 Phil. on Ev., part 2, p. 373, note 200; Id., 366, note 197; Lan v. Mumma, 34 Pa. St., 274; Acker v. Ledyard, 8 Barb., 514; Huntington v. Finch, 3 Ohio (N. S.), 445; Jordan v. Stewart, 23 Pa. St. (11 Harris), 244; Matthews v. Coulter, 9 Miss., 705; Bailey v. Taylor, 11 Cow., 531; Heffinger v. The State, 16 S. & R., 44; Commissioners v. Hannon, 1 N. & M., 554; Jackson v. Osborne, 2 Wend., 555; Neie v. Case, 25 Kan., 510; Tyrce v. Rives, 57 Ala., 173; Pyle v. Oustatt, 92 Ill., 209; 1 Lit. (Ky.), 219; 1 How., 104; 5 Barb., 279; Maybee v. Sniffin, 1 N. Y. (2 G. Smith); 15 Johns., 293; Scrivner v. The People, 33 Ill., 276.

3. The law having limited the quantity of land which could be granted by the government to one individual to eleven leagues, and such grant having been legally issued, and the concession under which the grant was made exhausted, the power or authority of the commissioner, whose authority was derived alone from such concession, to extend a title under this particular concession, ceased, and his acts in attempting to make an additional grant to the same individual was without authority of law, and void. Mason v. Russell, 1 Texas, 729–731; De Leon v. White, 9 Texas, 600; Hamilton v. Avery, 20 Texas, 612; Sherwood v. Fleming, 25 Texas Supp., 427; Gunter v. Mead, 78 Texas, 635; Pollard's Heirs v. Files, 3 Ala., 47; Patterson v. Winn, 11 Wheat., 380; Polk's Lessee v. Wendell, 9 Cranch, 87.

4. It is respectfully asked that this court reopen the decision in Hanrick v. Jackson, 55 Texas.

While we are willing to admit that so much of the opinion in that case which holds that a grant voidable alone for fraud in the officer

extending it, and that it can only be attacked by the State or some one holding a prior equity, is sound law, yet we are not willing to concede the court's premises that this grant is voidable only as applicable to the case as now presented. Our contention is, that the grant of October 22, 1833, purporting to have been issued to Rafael de Aguirre, is not only voidable, but absolutely void; not because of the fraud itself on the part of the officer extending such title (if in fact it was ever extended) as a grant to Rafael de Aguirre, but because, first, of the absolute want of power in the commissioner, Lesassier, to extend this second grant to Aguirre; second, of the illegality of the act in thus extending it, which appears from the face of the paper itself, and evidence aliunde.

To hold Lesassier's act valid would be, in effect, to hold that he had full power to grant eleven leagues of land without the aid of the concession, which could only be issued by the executive, and that the alcalde possessed power beyond the restrictions of the government in granting land. Certainly such a doctrine can not receive judicial sanction. There is no difference in principle in making a grant that the law says you shall not make, in doing a thing the law says you shall not do, and in granting land in a particular territory in which the law says grants shall not be made. The whole depends upon the same principle, viz., want of power or authority to do a prohibited act.

We therefore contend: 1. That as the law restricted the granting power of its agents to eleven leagues of land united in one person, that no officer whose duty it was at such time to grant land could grant to the same person two separate and distinct eleven league grants to different land. 2. That no officer authorized by the government did grant to Rafael Aguirre two concessions for eleven leagues of land. 3. That the concession granted on the 14th June, 1830, and the additional order of May 2, 1832, were exhausted by extension of the final title and act of possession of date 4th of October, 1833, granting the land on the Brazos. 4. That the pretended grant of October 22, 1833, to Rafael Aguirre to the land on the San Gabriel was issued without a concession to support it, and therefore void. 5. That as the commissioner, Lesassier, possessed no general power to grant eleven leagues of land, his authority and power in this particular matter ceased upon the extension of the final title and act of possession of October 4, 1833, granting the land on the Brazos to Rafael Aguirre.

*Walton & Hill*, for defendant in error.—The only point to which we wish to advert in reply to the argument of plaintiff in error, is that which grows out of the third paragraph from the last of the court's charge, and is as follows: "On the question of forgery of said final title, the burden of proof is on the defendant to establish the forgery, and it is incumbent on him to establish the forgery by a preponderance of the evidence."

This part of the charge, in the presence of the doctrine laid down in Stooksbury v. Swan, 85 Texas, 565, would probably be technical error; but we claim that it is not error in this case, at least not reversible error. Before a case will be reversed for error in the charge, the error must probably have some material effective weight to turn the scales of decision contrary to the direction they would have turned had the charge not been given. [Counsel discussed the facts.]

Immaterial error will not cause reversal. Gaston & Thomas v. Dashiell, 55 Texas, 530, and case cited; Railway v. Dillahunty, 53 Texas, 212; Bowles v. Brice, 66 Texas, 731, and cases cited; Erwin v. Bowman, 51 Texas, 513; De Montel v. Speed, 53 Texas, 339; Galveston v. Morton, 58 Texas, 409; Dotson v. Moss, 58 Texas, 152; James v. Thompson, 14 Texas, 465; Cook v. Wooters, 42 Texas, 296.

Where evidence is all on one side, the court may charge a verdict. Washington v. Bank, 64 Texas, 6; Baldridge v. Cartrett, 75 Texas, 633; Stewart v. Kemp, 54 Texas, 253, citing Reid v. Reid, 11 Texas, 585.

The original title has been upheld by this court in a most elaborate and exhaustive opinion by Chief Justice Moore, in Jackson v. Hanrick, 55 Texas, 17, in which every objection urged in this case against the validity of the original grant was adversely passed on by the full court. Forgery was not passed on, because not made; but there was and is no evidence in this case that does not point to one or the other of the objections overruled or not sustained in that case; and in no instance and in no respect does it point to forgery, or tend to establish forgery.

BROWN, ASSOCIATE JUSTICE.—Hanrick sued Howell in the District Court of Williamson County to recover a tract of land situated in that county; the venue was changed to Travis County, where the trial was had and judgment rendered in favor of Hanrick, which was affirmed by the Court of Civil Appeals.

Howell claimed the land under a patent issued by the State of Texas. Hanrick claimed it by virtue of an eleven league grant issued by the State of Coahuila and Texas, in 1833. The record is voluminous, but for the purpose of determining the questions presented in this court the following statement will be sufficient:

In the year 1830, Jose Maria de Aguirre, for himself and as attorney for Rafael de Aguirre and Thomas de la Vega, made a joint application to the Governor for permission to purchase each eleven leagues of land in the territory of that State. Upon the petition, the Governor issued the following permit or order:

"LEONA VICARIO, June 14, 1830.

"By virtue of article 24 of the colonization law of the 24th of March, 1825, I authorize each one of the applicants to purchase the eleven sitios (leagues) they apply for from the public domain of the State, at

such point as may suit them, after the commissioner appointed by the federal government shall have selected a sufficient quantity to cancel the debt due by the State to the federation. The duly qualified mayor (alcalde) of the municipality within whose jurisdiction said land may be located will put them in possession of the aforesaid sitios (leagues) and issue the respective patent thereto, previously classifying their condition and quality, so as to assess the amount they shall pay the State for them, for which payment the terms of the aforesaid law are granted to them. The petitioners will be furnished from the secretary's office with a copy of their application and of this petition, that upon application with them to the commissioner the ends proposed may be accomplished.

"A copy of the original filed in the archives of the secretary's office in my custody, from where it was ordered to be made by direction of H. E., the governor.

"Leona Vicario, June 13, 1830.

"SANTIAGO DEL VALLE, Secretary."

On the 2nd day of May, 1832, the same parties, by Jose Maria de Aguirre, applied to the Governor for an order that they be placed in possession of the lands, reciting the former order of date June 14, 1830, and that no objection had been made thereto, and continues in this language:

"It appears that the time has now arrived when they can proceed, without hindrance, to receive the lands they have contracted to purchase; and as it may happen that they might be located within the limits of some of the several colonization contracts for the distribution of whose lands a commissioner of surveys is appointed, he prays Y. E. to direct that not only the mayors (alcaldes) to whom they shall apply to put them in possession of the sitios (leagues) they may select, but also the commissioners of surveys within their respective jurisdictions, shall do the same, so as to avoid any inconvenience that might retard the possession they apply for. He prays Y. E. to comply with his request, wherein he will receive justice.

"Leona Vicario, May 2, 1832.

"JOSE MARIA DE AGUIRRE."

Upon the above application, the Governor issued the following order:

"LEONA VICARIO, May 2, 1832.

"In consideration of the foregoing application, and in conformity with the order issued from this department and transmitted to the head of the department of Bexar, on the 23rd day of June, 1830, I hereby appoint the commissioner for the distribution of land within the respective colony wherein the sitios (leagues) granted to the applicant and his associates may be located, and in case they are not included in any colony contract, then the mayor (alcalde) of the respective munici-

pality, or the nearest thereto, pursuant to the instructions and orders having reference to the subject, will proceed to give them the possession aforesaid.   The applicant will be furnished through the office of the secretary with a copy of his petition and of this order, for the purposes that they may be required, attaching the original to the document authorizing the purchase.                              "LETONA.

"SANTIAGO DEL VALLE, Secretary."

October 4, 1833, Samuel M. Williams presented to Luke Lesassier, the alcalde of San Felipe de Austin, a written request that he, as attorney of Rafael de Aguirre, might be permitted to select the lands for said Rafael de Aguirre on the west bank of the Brazos river, which was within the limits of Austin and Williams' colony.   The application was referred by the alcalde, Luke Lesassier, to Austin and Williams for their approval, with directions, that in case they consented, it was to be delivered to Francis W. Johnson, surveyor-general, to survey the land.   On the 5th of the same month, Samuel M. Williams, for himself and his partner, gave consent, and Francis W. Johnson surveyed the land, but the date of the survey is not given.

Luke Lesassier, alcalde of San Felipe de Austin, with the assisting witnesses, Robert Peebles and C. C. Givens, executed the protocol of the final title to the land, which was dated October 4, 1833.   This instrument recited, that Luke Lesassier, exercising the powers conferred upon him by the order of 2nd day of May, 1832, and in consideration of the sale made by the Governor on the 14th day of June, 1830, put Samuel M. Williams, attorney for Rafael de Aguirre, in possession of the eleven leagues on the west bank of the Brazos river, conferring title upon him thereby; referring to the field notes made by Francis W. Johnson for description.

The field notes returned by Johnson begin thus:   "The land that I have surveyed by virtue of your foregoing order to the attorney for the citizen Rafael de Aguirre, is located on the west bank of the Brazos River, and contains the lines, boundaries, limits, and corners following," giving the metes and bounds.

The title appears to be complete and formal, and was deposited in the Land Office, as required by law.

October the 4th (the same date as the first application), Samuel M. Williams, as attorney for Rafael de Aguirre, presented to the same alcalde of San Felipe de Austin a second application, based upon the same permit, to purchase eleven leagues of land, dated June 14, 1830, and the order of the Governor of May 2, 1832, for permission to select and have surveyed eleven leagues of land for Rafael de Aguirre, ten to be located and surveyed on the San Andres River and Cow Bayou, which embraces the land sued for, and one at another place.   This land was also within the limits of Austin and Williams' colony, and was by the alcalde referred, on the — day of October, 1833, to Austin and Williams, for their approval, and upon approval to be delivered to

Francis W. Johnson, surveyor-general, and by him to be surveyed. Consent was given by Samuel M. Williams, on the 5th day of October, 1833, and Johnson, the surveyor-general, surveyed the land and returned the field notes, which are without date.

Upon this second application a final title was made out, from which we make the following extracts: "At the city of San Felipe de Austin, on the twenty-second day of the month of October, in the year one thousand eight hundred and thirty-three, I, Citizen Luke Lesassier, the duly constituted mayor (alcalde) of this city and its municipality, in the exercise of the powers conferred upon me by the order dated at Leona Vicario, on the fourteenth day of June, 1830, and 2d of May of the year last past, and in consideration of the sale authorized by the said executive in favor of the citizen Rafael de Aguirre, resident of said Leona Vicario, for eleven sitios (leagues) of land, as appears by his executive order, dated at the said Leona Vicario on the said fourteenth of June, 1830," etc., * * * "I confer upon and put the aforesaid attorney of *Perfecto Valdez* in the full, actual, and corporeal possession of eleven sitios (leagues) of land, the same that he applied for and were sold to him by the government, on the San Javiel Creek and Cow Bayou."

This title was signed by Luke Lesassier, with Robert Peebles and C. C. Givens assisting witnesses, and at the bottom, above the names of the alcalde and witnesses, is this note: "Interlined—y 2 de Mayo, po po anno—valid—Altered Catorce. Rafael Aguirre—arroya San Javiel —valid; also Juno—Juno valid."

Wherever the words "Rafael de Aguirre," "fourteenth," "June," "San Javiel Creek," appear in the application, the reference by the alcalde to Austin and Williams, and the final title, the evidence shows, that other words had been scratched out and the words there appearing written over the erased word. The evidence tends to prove, that where the words "Rafael de Aguirre" were thus inserted, the words "Perfecto Valdez" had been erased; and that where the word "fourteenth" was thus inserted, the word "thirteenth" had been erased; that July (Julio) was erased where "June" is inserted; and that in the grant, the words "Brazos River" were erased and "San Javiel Creek" inserted, and "Cow Bayou" interlined. Also, that "2d of May of the year last past" was interlined.

On the 13th day of July, 1830, the Governor of Coahuila and Texas granted permission to Perfecto Valdez to purchase eleven leagues of land, to be selected by him out of the public domain, and directing the alcalde of the municipality where selected, or of the nearest thereto, to put him in possession and give evidence of title. No application appears to have been made to the alcalde on this permit, except as shown by the second application made by Williams, set out above. Samuel L. Williams gave consent to the selection within the colony of Austin and Williams, February 8, 1833, and the land was surveyed by William Moore for Mrs. McManus, May 1, 1833, on the east bank of

the Brazos River. No final title is shown, unless the one under which plaintiff's claim was so issued to Valdez, and changed as claimed by defendant, to Rafael de Aguirre.

Defendant in the court below filed a general denial, plea of not guilty, and pleas of the statute of limitations of three, five, and ten years. He also filed an affidavit that the original of the grant and other papers were forged.

The following questions are presented to this court by the plaintiff in error:

1. That under the law then in force the grant was void, because the alterations were not made according to law, although noted at the foot, and before the signature of the officer.

2. If the paper is valid, it does not vest title in Rafael de Aguirre.

3. That the court erred in charging the jury, that the papers introduced by plaintiff were regular upon their face, and, with proof of heirship, were sufficient to entitle him to recover, if they found that the grant was not forged.

4. That the court erred in withdrawing from the jury certain facts as evidence of forgery.

5. That the court erred in placing the burden of proving that the alterations were made after the signing of the grant, upon the defendant.

6. That the grant under which plaintiff claims title is void, because prior to the making of the said grant the alcalde had made to Rafael de Aguirre a valid grant of eleven leagues of land under the same concession, and by virtue of the same power, and that his power was exhausted by the making of the first grant.

Plaintiff in error claims, that if the alterations, interlineations, and erasures which appear on the face of the protocol of this title were made before the same was signed by the officer, and noted, as appears on the face of the instrument, in good faith, the grant is void, because the words erased were not barred out and the substituted words written above, and in the amendation clause both words mentioned, that which was barred out made invalid, and the words inserted made valid. So far as the erasures and interlineations affect the validity of the instrument, the law in force at the time must govern. We find translated and copied into the opinion of the court in Hanrick v. Cavanaugh, 60 Texas, 1, the law as it then was, so far as it affects this question. We copy such part as we deem applicable to the questions here presented, as follows:

"In order that a public instrument be considered authentic and lawful, the following circumstances are required. * * * Page 888, second column: 8. That the document be cleanly written, without blanks, erasures, obliterations, interlineations, or corrections, especially in the substantial parts; for example, in the names and surnames of parties, of the notary public, and the witnesses, in the terms and the amount, and the thing in relation to which the writing is

done, in the compact and conditions, and in the day, month, and year of the date, and in the place where the instrument was executed; and that in case that any correction, obliteration, or addition be made at the time of reading the instrument to the parties, the same be authenticated at the foot of it by the notary, previous to the signing, in order to prevent suspicion of fraud. Ley III, title 8, part 3; Ley XII, title 19a, part 3; Ley I, title 23, Lib. 10, Nov. Rec., and Code de Cem., art. 240.

" The two laws of the Partidas above quoted characterize as suspicious and unworthy of credit any instrument of writing which has been scratched, corrected, underscored, written over, or torn or cut in any of the substantial parts above referred to, unless the party introducing it shall prove that it was done by force or accident; and on the contrary, they require its admission as valid if it bears no such vices or defects in any of its essential parts, and when there is no suspicion of a fraudulent intent.

" But shall we also apply the first part of the provisions to the 'matrix' preserved by the notary public among his protocols? If the instrument (the matrix) appears with the obliterations, additions, corrections, or other alterations not authorized as the law requires, shall it be null and void to the prejudice of either, and perhaps both parties? We may suppose either that the two instruments were closed and signed after the alterations were made, or on the contrary, that the alterations were made after the instrument had been perfected and signed. It would be natural to suppose that the instrument was closed and signed without the alteration, for the presumption is, that while writing, the notary public would conform himself to the requirements of the law, and the law required him to mention and authenticate them before signing, if in fact they existed at that time. Therefore an instrument shall not be null on account of the failure to approve or authenticate the alteration that may be found in it, because it should not be in the power of the notary public or anybody else thus to destroy the effects of an authentic document to the prejudice of the parties interested; but on the contrary, the alteration shall bear the vice of nullity, the additions, writing over, erasures, and corrections shall be considered as not having been made, and the words unlawfully written over, or erased, or altered, shall be considered as existing, and shall have all their effects when their tenor can be ascertained, or an interpretation or combination of that which precedes, or that which follows, discloses their meaning."

It is our opinion, that the penalty of *nullity* did not attach to *erasures* and *interlineations* except where the same were not noted at the foot of the instrument before it was signed by the officer, and that where this was done the instrument was valid. In this case, the interlineations and words inserted were so noted, as the law says *"authenticated,"* by the officer before the signature; at least it so appears upon the face of the paper. It follows, that if valid, that is, if it was so interlined before

signing, the grant was not invalidated by such alterations. We see nothing in this law, nor in any other that has been called to our attention, which renders void a public instrument which was altered, if the words to be changed were not barred out and others inserted above them. We hold, that the grant was not void for this reason.

Rafael de Aguirre purchased the eleven leagues of land from the government, with the right of selection, and his right depended upon the concession issued by the Governor. Clay v. Holbert, 14 Texas, 202. The concession, the order of May 2, 1832, the application for the survey, the permission to locate in the colony limits, and the field notes, were all in the name of Rafael de Aguirre, and the prococol itself recites, that the grant is made in pursuance of the authority conferred by the concession to Rafael de Aguirre, and on application of Samuel M. Williams, his attorney; and then says, in substance, that possession is given and title conferred upon the "said attorney of *Perfecto Valdez.*" This is a clear mistake. It was an oversight in not erasing the name of Valdez, whether made before or after execution and delivery. Such a mistake in the name can not have the effect to defeat the grant, if otherwise valid, which is shown by all the papers preceding, and the context, to have been made to Rafael de Aguirre. Clay v. Holbert, 14 Texas, 202; Hanrick v. Jackson, 55 Texas, 17.

The court did not err in instructing the jury, that the muniments of plaintiff's title were regular on their face, and, with the proof of heirship, entitled plaintiff to recover if the grant was not forged. There was no question about the heirship, and the court properly reserved for the jury the question of forgery, which was the only question as to the title, as shown by the evidence. We do not think that the jury failed to understand this charge, and that they did not conclude that the court in that charge made any reference to the erasures shown on the face of the paper, or expressed or intimated any opinion as to the weight to be given to them. The Court of Civil Appeals did not err in its decision upon the second and third points presented.

It is insisted for plaintiff in error, that the court erred in giving the jury the following instruction:

"The fact that a subsequent location or locations of pre-emptions or land certificates have been made by the defendant or other person on the lands granted by either one of said titles, or the fact that a patent or patents have been issued on said subsequent location or locations, or the fact that the two said eleven league tracts of land, or either one of them, were not surveyed on the ground, or the fact that there have been claims adverse to said eleven league titles or to either one of them, or the fact that the said eleven league surveys or either one of them have been dropped from the map or maps in use in the General Land Office, does not in any way affect the validity of either one of said titles so in fact extended to said Rafael de Aguirre."

The evidence tending to establish the facts mentioned in the charge had been admitted to the jury, we believe, in every instance over ob-

jections of the plaintiff, and it was proper to withdraw them or limit their effect by the charge. We do not see how a fact mentioned could legitimately affect the conclusion to be drawn as to the issue of forgery of the title. They each and all transpired after the time when the grant was made, and were in no way connected with the acts of any of the parties who participated in procuring or issuing the grant. There was no error in this charge.

The protocol of the title in question in this case was deposited in the General Land Office, and became an archive of that office. The plaintiff in the court below introduced in evidence a certified translated copy of the protocol. Defendant introduced evidence tending to show that the original had been changed in material points, and the issue of forgery was thus made. The court charged the jury as follows:

"On the question of forgery of the said final title, the burden of proof is on the defendant to establish the forgery, and it is incumbent on him to establish the forgery by a preponderance of the evidence."

Plaintiff in error contends that the court erred in giving this charge, and claims that the burden of proof was upon the plaintiff to prove the grant to be genuine, and to account for the erasures and interlineations.

The affidavit of forgery was unnecessary in the case. The instrument is not embraced in article 2257, Revised Statutes. The same proof would have been required of the parties respectively if it had not been made. Parker v. Chancellor, 73 Texas, 479.

If the admissibility of the copy had depended upon the age of the original, or upon proof of its execution, or if the erasures and interlineations had not been noted at the foot of the paper, the burden of proof would have been upon the plaintiff, and the charge erroneous. Stooksbury v. Swan, 85 Texas, 563; Park v. Glover, 23 Texas, 469. But the certified copy of the grant was admissible without reference to its age and without proof of its execution, because it was a copy of an archive of the General Land Office, and because the original, being an official act, proves itself, and would be admissible in evidence without proof. Houston v. Perry, 5 Texas, 462; Andrews v. Marshall, 26 Texas, 216; Hatchett v. Connor, 30 Texas, 109; Railway v. Jarvis, 69 Texas, 527. No proof being required of the plaintiff, the issue was made upon the instrument by the defendant, and the burden of proof rested upon him, upon the familiar principle, that the burden rests upon the party who has the affirmative of the issue. The defendant claimed, that alterations noted at the foot of the grant were made after the grant was executed and delivered, and upon this issue the burden rested upon him. Thompson v. Thompson, 12 Texas, 327; Wells v. Moore, 15 Texas, 521; Peverler v. Peverler, 54 Texas, 53. It is true that it is said in Park v. Glover, 23 Texas, 469, that it rested with the party offering an instrument which appears upon its face to have been altered, to account for the change; but in that case the alteration was

not accounted for at the foot of the paper.    There was no error in the charge of the court as applied to the facts of this case.

Under the law in force when the title under which Hanrick claims was issued, no person could purchase from the government more than eleven leagues of land.    Colonization Law of 1825, art. 24; Laws C. and T., p. 19.    The concession granted by the Governor of the State to Rafael de Aguirre states that it is issued under that article of the law, and concedes to him the right to select and purchase eleven leagues of land out of the public domain of the State; the commissioner or alcalde is directed to have that quantity of land surveyed, to put De Aguirre in possession of it, and to give to him the evidence of his right.    The duties of the alcalde were purely ministerial; his power was clearly defined in the documents issued by the Governor, without which he had no authority whatever.    Clay v. Holbert, 14 Texas, 202.

The evidence shows, that under the same authority—the concession of June 14, 1830, and order of May 2, 1832—Luke Lesassier, alcalde of San Felipe de Austin, issued another grant to Rafael de Aguirre for eleven leagues of land situated on the west bank of the Brazos River, which grant appears to be in all respects regular.

It is claimed by the plaintiff in error, that when Lesassier made this grant he exhausted his power, and that if the title under which plaintiff below claims was in fact issued by Lesassier to Aguirre, he had no authority so to do, acted in violation of law, and his act was void.    The court charged the jury as follows:

"If Luke Lesassier, alcalde of the municipality of San Felipe de Austin, in fact extended to Rafael de Aguirre two titles for eleven leagues of land each, with the knowledge of said Rafael de Aguirre, or his attorney, Samuel M. Williams, such act was not a forgery as to either one of said titles, but was in law a fraud on the government; and the government only, and not the defendant in this case, can question the validity of either title so in fact extended to said Rafael de Aguirre."

It is claimed by counsel for defendant in error, that the question has been decided by this court in the case of Hanrick v. Jackson, 55 Texas, 17; and this view seems to be conceded by counsel for plaintiff in error.

In the case referred to, Chief Justice Moore delivered the opinion of the court, and in the course of it he said:    "But it is said, that if this grant is not void upon its face, it is shown by extraneous testimony to have been extended by the officer from whom it emanated, without authority, in violation of law, and in fraud.    That a grant may be shown to be void by proof that the officer had no authority to make such grant, or that the law did not warrant it, is beyond question. But if such grant is authorized by law, and may be legally issued by the officer from whom it emanates, we are not prepared to admit that it may be attacked for fraud not appearing on the face of the grant, except by the government or some one having a pre-existing equity,

unless the right to do so is expressly conferred on the party attacking
it by law." The learned judge proceeds to state and discuss the ques-
tion raised upon the concession, and then continues: "It is, however,
urged with much force, that while there was a concession of eleven
sitios of land to the grantee, this concession had been fully satisfied by
the extension of the title upon it for other lands prior to the date of
the present grant. And therefore the extension of this title purport-
ing to be in satisfaction of the same concession, must be regarded as
extended without authority, and as a fraudulent attempt to appro-
priate double the quantity of land to which the grantee was legally
entitled." The opinion then recites the facts bearing upon this ques-
tion, and states the conclusion, as follows: "Appellee insists, that by
the extension of title for land on the Brazos the authority of the officer
to make a grant to the interested party was exhausted, and all subse-
quent acts by him were null and void. But in our opinion, the facts
do not warrant the conclusion. The alcalde by the order was clothed
with the authority to extend title to the interested party, and must de-
termine how and when he had done so. * * * But while we admit
that the want of power of an officer to make a grant may be shown,
as has been often held, to invalidate such grant, we do not think ap-
pellee brings this case within this rule by proving, if such is the proper
conclusion from the evidence, that Lesassier granted eleven sitios of
land prior to the date of the title now in question. The want of author-
ity of the officer which renders the title void is to be shown by the
law, or that he attempted to exercise his authority beyond the territory
over which he has jurisdiction, or something of the like character, and
not from proof of mere error of the officer in extending to one not in
fact legally entitled, but whom he supposed to be. The alcalde was
an officer authorized to grant titles of this character. True, his au-
thority did not justify him in extending to Aguirre more than eleven
leagues of land. Nor should the board of land commissioners give
more than one certificate to the same applicant, or the Commissioner
of the General Land Office issue a second patent on the same certificate;
but to do so, would be an improper exercise of authority, rather than
an act without authority. So we think the action of the alcalde, if
unwarranted, was an erroneous exercise of authority, instead of an
act without authority."

It is said in the opinion quoted, that the alcalde "was an officer
authorized to grant this character of titles." If it was intended to
assert that such officers were invested by law with that authority, it
is not sustained by any statute law of that State that we have been
able to find, nor by any rule of decision adopted by courts or officials
of that government. On the contrary, the twenty-fourth article of
the colonization law gives the right to purchase from the government
alone, and the unbroken line of decisions in this court, so far as we
have been able to discover, is, that the concession must proceed from
the Governor. Alcaldes as such had no authority to issue these titles,

but acted only when empowered by the Governor so to do. The power given to the alcalde in this case was a special power authorizing him to perform a single act, with reference to one grant of land, to be extended to a specified person. He was invested with no discretion; the quantity of land to be granted was determined, and the person entitled to it was ascertained; in fact, every right was settled before the business came to his hands. It is not analogous to the case of a board of land commissioners or the Commissioner of the General Land Office. They were empowered by law to issue certificates or patents, to determine when they should be issued, and to whom; they acted for the State, and bound the State. Neither is it governed by the same principles as the case of Johnson v. Smith, 21 Texas, 722. In that case, the grant did not require the approval of the federal executive; the commissioner was empowered to determine who were entitled to such grants, and the court rightly held, that his decision could not be attacked by a party who had no prior right. The case of Sideck v. Duran, 67 Texas, 256, was decided upon the ground that the first survey was abandoned in making the application for the second one.

The rule laid down in Hanrick v. Jackson for determining whether or not the officer had authority to make the grant is, that the want of power must be shown by the law, or that he attempted to exercise his authority beyond the territory over which he had jurisdiction. The rule itself shows that it is not applicable to this case, for the reason, that the authority exercised was not conferred by law, and therefore could not be measured by the law; there was no territory over which he had jurisdiction in such matters, and this test of territorial jurisdiction could not be applied.

The court, in the course of the opinion, on page 32, says: "Certainly in our opinion it can not now be questioned by a party having no pre-existing equitable claim or interest." This is based upon a recital of facts, and is in truth a decision, that under the facts of the case the claim had become valid, although it might have been improperly issued.

The court as then organized had authority to decide upon the evidence in the case; but this court has no such power. We therefore refrain from discussing the evidence, but feel called upon to say, as matter of law, that the defendant below was not called upon nor required to prove that De Aguirre accepted a grant for which he, by attorney, applied, which was located at a point that he designated, or that the testimonio did not issue to land of which his grant declares that he received possession and evidence of title, nor that he paid dues to the government, as it was his duty to do. The question here presented is, assuming that Luke Lesassier, in pursuance of the authority conferred by the concession and order of the Governor, did make a valid grant to De Aguirre of eleven leagues of land prior to the time when this grant was made, did the making of the first grant exhaust his power, and is the second grant void? We have no doubt

—upon authority and sound principle—that if it be shown that a valid grant was issued under the power vested in Luke Lesassier by the Governor, that is, one which vested title to the land on the Brazos River in Rafael de Aguirre, the power conferred upon him by the Governor was thereby exhausted, he had no authority to make the second grant, and it is absolutely void as to all persons. 1 Sug. on Powers, marg. p. 90; Smith v. Taylor, 21 Ill., 303; Ward v. Barrows, 2 Ohio St., 241; Fritsch v. Klausing, 13 S. W. Rep., 241.

Whether or not the first grant was made complete, whether it was afterwards lawfully abandoned, and all facts bearing upon the validity of the first grant, are questions to be left to the jury, under proper instructions from the court. The trial court erred in giving the instruction complained of, and the Court of Civil Appeals erred in not sustaining the assignment of error based upon the giving of that charge, for which errors the judgments of both courts are reversed, and the cause remanded to the District Court of Travis County.

*Reversed and remanded.*

Delivered February 7, 1895.

### ON MOTION FOR REHEARING.

*E. J. Gurley* and *Walton & Hill*, for defendant in error, on motion for rehearing.—Our attention will be directed to one point. A suggestion may be made as to another, but such other is only collateral.

The court decides in substance:

1. That Luke Lesassier was in the nature of a special officer to issue the final titles to the two Aguirres and Tomas de la Vega on their joint concession from the Governor of Coahuila and Texas.

2. That if in that capacity he issued to Rafael de Aguirre a complete and perfect title to eleven leagues on the Brazos, of date 4th of October, 1833, then such act on his part was an execution of the power vested in him, and an exhaustion thereof.

3. That if such be the fact, then that the issuance by him on the 22nd October, 1833, of another title by virtue of the same power, was a void act, and conferred no right, unless it be shown that the first title was legally abandoned.

4. That unless legal abandonment of the title dated 4th, as above, be shown, then in 1874 the land embraced in the second or junior title was subject to be appropriated by individuals by virtue of genuine Texas land certificates, and also subject to be appropriated by pre-emptors under the laws of Texas.

While the foregoing is not the language of the court, yet it is what we understand to be the exact meaning of the decision.

Our general counter-propositions are these: 1. That Lesassier was not in the sense of the law a special commissioner, but was one of a class, all of whom had power to issue titles of the character of the one involved; not by being specially empowered, but merely by having the

concession referred to him; or if that be not exactly so, they had power to issue land titles.

2. That he was a public officer, vested with power by law to issue land titles; and that his act under question was only in excess of authority, if not within the law, and conferred colorable right, which may not be attacked by individuals, but by sovereignty alone.

3. That where a title is a perfect legal title on its face, individuals can not bring up matter aliunde the perfect face to mar or destroy it, unless they do so in the assertion of a contemporaneous equitable right superior to the legal title in its inception or consummation.

4. That forty years is too far removed from the res gestæ in which to inaugurate action through testimony dehors the record to undo what it appears to be on its face, and which for these forty years has been recognized by government to be a perfect thing, and the depository of lawful right to land.

5. It is the public policy of Texas, as of every other civilized government, to quiet titles to lands—to make them fixed, safe, and to remove them from the domain of conflict and litigation.

6. The power of Lesassier was not exhausted until he had issued three titles by the authority of the concession dated 14th June, 1830.

Special propositions: 1. In law, under the doctrine of relation, the second title is the elder and superior, or else both the titles to Aguirre, mentioned as first and second, are of the same date.

2. The issuance of the two titles to Rafael de Aguirre is a patent mistake on their face.

3. The State resumed dominion over the territory embraced in the first title, granted it away in payment of its land certificate indebtedness, which was tantamount and equivalent to election—denunciatory of one title, and the validation, affirmance, and sufficient recognition of the other.

4. The Republic of Texas received pay for the second grant after the revolution.

5. The question decided by the court was not, under the law nor under the rules of the court, before the court for decision, never having been made in the trial court nor in the Court of Civil Appeals.

6. The question as to the legal validity of the second title was limitedly made below, but only limitedly, and as a circumstance to be considered by the jury on the issue of forgery.

Citing: Johnson v. Smith, 21 Texas, 729; Hancock v. McKinney, 7 Texas, 442; Galloway v. Finley, 12 Pet., 197; 7 Wheat., 214; United States v. Arredondo, 6 Pet., 731; Airhart v. Massieu, 98 U. S., 498; Truehart v. Babcock, 51 Texas, 169; Westrope v. Chambers, 51 Texas, 178; Summers v. Davis, 49 Texas. 541; Swift v. Herrara, 9 Texas, 280; Maxey v. O'Connor, 23 Texas, 239; Winsor v. O'Connor, 69 Texas, 571; Howard v. Colquhon, 28 Texas, 145.

We pass to a second view of the decision, wherein it is decided, that the extension of the first grant to Aguirre, on the Brazos, was an

exhaustion of the concession, and also of the power of Luke Lesassier under it. We are sanguine in the hope and confident in the belief that the court can be convinced of its error in the above utterance.

The court will remember that the concession does not name Lesassier; he is not thereby empowered as an individual. He is mentioned as one of a class, and that in the alternative. We take it to be the law, from tradition and custom, that alcaldes had, in connection with other duties, the power to issue land titles, and this belief is derived from the fact known to the court, that Alcalde Lesassier issued the greater portion of all the eleven-league grants in Texas; and no authorization was ever directed to him by name, as an individual, but uniformly in the character of alcalde. The authorization was directed to an officer of government. As said by Judge Wheeler, in Hancock v. McKinney, 7 Texas, 445, 446, the power vested in the Secretary of State—or any officer of government, in fact—was never known to the courts of Texas, and this was long, long ago, when we were comparatively near the time of the former government. See Treoute v. San Francisco, 100 United States, where it is said, page 252: "The alcalde of a pueblo exercised the power of distributing the lands of the town in small quantities to the inhabitants."

If there were difficulties then in definitely, or even with any degree of legal satisfaction, ascertaining the powers of a recognized governmental arm, how much greater and insurmountable is the difficulty at this late day of judicially declaring what an alcalde could or could not do under the unknown powers vested in him. The Supreme Court of the United States, in Spencer v. Lapsley, 20 Howard, 271, when the title issued to Vega by Lesassier by virtue of the concession before the court was under discussion, says, that alcaldes had power to issue land titles. Such was the construction put on Texas decisions by that court. See also Merryman v. Bourne, 9 Wallace (U. S.), 601. In case of doubt, the safer rule is to let the presumption of the law prevail, that officers of a former government acted within their powers. That is the rule that has for generations anchored titles so emanating to pillars of safety and stability, and protected innocent purchasers for value in their acquired rights. We are driven to the conclusion from the history of the country, judicial as well as political, social, and material, that alcaldes had power to issue land titles, but perhaps could not put themselves in motion, but could act with power when a matter was referred to them. A latent power, just as power lies dormant in a court until it is put in motion by some proceeding, or transaction, or controversy brought before it. Ayuntamientos, chief of which was the alcalde, had power to issue land titles, and to recall them on the grantee abandoning the country, failure to cultivate, or pay purchase money. So this court has decided (Holliman v. Peebles, 1 Texas, 699); but there is no statute, decree, or written regulation which directly or by implication vests such power in them, that we

have been able to find except in section 11 of the decree of 4th January, 1813, found in Dublan & Lazano, 397–399, and is as follows:

"XI. The designation of these allotments shall be by the constitutional ayuntamiento of the towns to which the lands correspond, as soon as the interested parties shall present to them the documents that accredit their good service and retirement, hearing the syndic solicitors upon all, briefly and administratively, without any cost or dues being exacted. In continuation the expedients (expedientes) shall be remitted to the provincial deputation, in order that it may approve the same, and repair any injury."

See also article 26 of Colonization Law of 1824, Laws Coahuila and Texas, pages 19, 20.

The case of Summers v. Davis had origin from the recalling of a title by the ayuntamiento. 49 Texas. There the title was recalled in 1826. The land was located over in 1852, and patented. These two titles came in legal conflict. The old title had article 908, Paschal's Digest, behind it, as did the Muldoon grant in Truehart v. Babcock, 51 Texas, 169. In both cases the court sustained the old title, not because the one had not been recalled, nor the other absolutely void, but because they had been titled or surveyed. The Muldoon title was absolutely void, as void as if it never had been, and yet locations over it were not allowed. It may be, that we will be answered by pointing to article 908, supra; true, that is a specific answer to these two cases, but is not an answer to the proposition contained in them, that the acts of officers of former governments will be respected until want of authority is satisfactorily shown. Nor is it an answer to the great line of cases which say, that individuals shall not attack titles procured in fraud; that only the government could do that. What do the courts mean when they use such language? It is not, we imagine, to protect perfect titles; they protect themselves. There must be a class of titles that are not perfect, not titles that are irregular, but titles that are in some material particular defective, which, according to technical law, would avoid the title. But we dare say, that there is no case where the face of the title was perfect that it has ever been successfully assailed.

We invite the attention of the court to the following sections of the colonization law of 1825, under which the title being debated was authorized and issued: Sec. 24, Colonization Law of 1825, Pasch. Dig., 586, authorizing sale of eleven leagues, and note thereunder.

Border and littoral leagues excluded from sale save by consent of federal executive: Id., art. 569, sec. 7.

Issuance of land titles under said law: Sec. 4, Instructions to Commissioners, Pasch. Dig., 614; Holliman v. Peebles, 1 Texas, 699.

No lands could be granted without the consent of empresarios, even though grants thereof should be authorized by the executive. Pasch. Dig., art. 639 (this article of the law was withdrawn May 16, 1835); Id., art. 640.

In Edwards v. James, 7 Texas, 372, Chief Justice Hemphill refers to the clouds that obscured the legal heavens in regard to the power of Mexican officials over the subject of land titles.

He also affirms the power of the ayuntamiento to certify a basis for concessions, and then proceeds: "The only remaining objection [to the title] is, that the title was extended by the first regidor; whereas the commission was directed to an alcalde, and that the grant is therefore void for the want of authority in the granting officer. It is sufficient to say, in answer to this objection, that the commission is directed to an alcalde, and it may therefore be executed by one who is charged by law with the powers and duties of that office. In case of decease, legal impediment, or vacancy of the office of alcalde, his place was filled by the regidor."

This decision manifests the legal truth, that these commissions to issue land grants were directed to officers of government and could be executed by their successors, were impersonal, not individualized, but were directed to a depository of power, to be drawn on, and when drawn on and put in motion, the powers were executed officially at the discretion of the officer. Art. 11, dec. 262, Laws Coahuila and Texas, p. 238; Id., art. 6, dec. 124, p. 144.

But 3. The claim of plaintiff in error is subsequent to the State Constitution. Hanrick's title can not be questioned in this suit. It is good against plaintiff in error. Const., art. 14., sec. 2.

BROWN, ASSOCIATE JUSTICE.—Upon the motion for rehearing in this case, the defendant in error presents the question for our consideration, that if the grant made to Rafael de Aguirre in Williamson County be void, it is nevertheless such title as is protected from the claim of plaintiff in error under the Constitution. We have therefore concluded to submit to counsel for both parties the following questions, to be argued orally or in writing, as they may choose:

1. Assuming that the grant under which defendant in error claims. was issued after a prior valid grant had been made to the same party under the same authority, and that it is therefore void, is it titled land, or is it equitably owned under the provisions of article 14, section 2, of the Constitution?

2. If it comes within the terms of the Constitution as to the location of certificates, will the prohibition therein apply to the claim of plaintiff as a pre-emptionist or claimant of a homestead under the Act of May 26, 1873, entitled "An act for the benefit of occupants of the public lands?"

Arguments allowed herein will be confined to the foregoing questions, and will be heard on such day as counsel may agree upon, or that may be hereafter fixed by the court in case no agreement is had.

Delivered April 11, 1895.

ON REHEARING.

*A. S. Fisher*, for plaintiff in error.—Counsel discussed art. 18, Plans and Powers of Prov. Gov. of Texas, 4 Sayles' Stats., 145; Const. 1845, art. 7, sec. 21; Const. 1861, art. 7, sec. 21; Const. 1866, art. 7, sec. 21; Const. 1876, art. 13, sec. 5; Const. 1876, art. 16, sec. 18, in connection with sec. 2, art. 14, Const. 1876; Pasch. Dig., art. 809; Adams v. Railway, 70 Texas, 272; Summers v. Davis, 49 Texas, 541; Truehart v. Babcock, 51 Texas, 169; Westrope v. Chambers, 51 Texas, 178; Galloway v. Finley, 12 Pet., 293; Jackson v. Clark, 1 Pet., 636; Taylor's Lessees v. Myers, 7 Wheat., 26; Lindsey v. Miller, 6 Pet., 675; McArthur v. Dunn, 7 How., 270; Winsor v. O'Connor, 69 Texas, 571; Day Land and Cattle Co. v. The State, 68 Texas, 525; Railway v. Locke, 74 Texas, 370.

A study of these cases will show, that no case has been decided by this court which holds that the effect of section 2, article 14, of the Constitution, is to confirm a grant which at such time was absolutely void.

We maintain, that it was not the purpose of the constitutional convention by this section to grant any land, or to do other than confirm an imperfect right then in existence, or a grant voidable only.

When there is an absolute want of authority in the person assuming to act, he is neither a de jure nor a de facto officer; in other words, he is a mere usurper, whose acts confer neither right nor color of right, neither an apparent right in law, nor a colorable right in equity.

To hold that this pretended grant was confirmed, would be to hold that it was granted. If it was void, it was never granted, because it was not an act of Coahuila and Texas, but it was the act of Lesassier, acting without any authority whatever. There being no authority in him to grant, it can not be said to be either titled or equitably owned under color of title, as the term, sovereignty of the State, has reference to both title and color of title.

The Constitution, section 2, article 14, makes no distinction between lands titled and equitably owned under color of title; they both stand upon the same plane, and to come within the protection of article 14, section 2, there must either be in law a title or in equity a title.

A pretended grant extended to a person without right in him to take, and without semblance of authority in the officer assuming to extend, can not be said to be either "titled land or land equitably owned," when no title whatever passes either in law or equity.

As said by Justice Robertson, in the case of De Court v. Sproul, 66 Texas, 370: "A void grant is a mere vacuity; its issuance leaves the title in the State."

It is said by Justice Brown, in the case of Dawson v. McCleary, 87 Texas, 524: "If the corporation had performed all of these acts, the surveys made, without the certificate being issued by the Commissioner of the General Land Office, were without authority and void. The

defendant had no right, legal or equitable, in the land.   It is suggested by the Court of Civil Appeals, that this land being 'equitably owned' by defendant Skinner, was not subject to location under section 2, article 14, of the Constitution of 1876.   The claim here presented does not come within the provisions of the Constitution.   Adams v. Railway, 70 Texas, 272.   In the case last cited, the court say:  'It must not only be claimed under such color of title, but the facts which give color of title must also give equitable ownership, or the provision of the Constitution does not give protection.'   This was an attempt to appropriate land without any lawful authority, and could not constitute color of title.   The land was subject to location by plaintiffs."

The following cases hold that a void title is neither title nor color of title, and confers no right, and will not even support a defense of limitation under the three years statute.   Smith v. Power, 23 Texas, 30; Marsh v. Weir, 21 Texas, 97; Bryan v. Crump, 55 Texas, 11; Parker v. Bains, 59 Texas, 15.

Does the prohibition as to the location of certificates apply to pre-emptionists or claimants of homesteads under the Act of May 26, 1873?

Section 6, article 14, of the Constitution of 1876, is as follows:   "To every head of a family without a homestead there shall be donated 160 acres of public land, upon condition that he will select and locate said land and occupy the same three years, and pay the office fees due thereon.   To all single men of eighteen years of age and upward, shall be donated eighty acres of public land, upon the terms and conditions prescribed for heads of families."

This section of the Constitution contains no proviso such as that contained in section 2, article 14, of the Constitution, evidently showing it to be the intention of the framers of the Constitution not to embrace within the terms of the proviso of section 2, pre-emptionists and claimants of homesteads.   These terms, certificates, pre-emptionists, and claimants of homesteads, have had, since the beginning of our governmental land system, well defined, separate, and distinct meanings, which have always been recognized by every department of government since its first organization.   Evidently, therefore, it was the purpose of the framers of the Constitution, in using the term "certificate," to give to it not only its technical meaning, but its meaning as commonly accepted and understood, and not to enlarge the proviso so as to include any other mode of acquiring land than by certificate.

It has been for years the policy of Texas to encourage the settlement of its lands by actual settlement, as well as to limit the right of acquiring lands by location of certificates.   Johnson v. Eldrige, 49 Texas, 523.

It is not claimed that the exception or the proviso contained in section 2, article 14, includes eo nomine pre-emption and homestead claims.   If such are to be included, it is so alone from construction.

We understand the rule to be, when the lawmaking power has prescribed a general rule with special disabilities or privileges affecting

a particular class of things or persons, these can not be enlarged or extended to objects not embraced in the exception by mere implication or from parity of reason, and the affirmative description of the class of persons or things embraced within the exception must necessarily exclude all not comprehended within its literal meaning. Tyson v. Brittain, 6 Texas, 222; Snoddy v. Cage, 5 Texas, 107; Roberts v. Yarboro, 41 Texas, 450.

The Howell pre-emption, the one in controversy in this suit, was surveyed May 4, 1876, under the pre-emption laws then in force. Subsequently, article 3936 of the Revised Statutes was enacted, as follows: "No person shall settle upon or occupy, nor shall any survey be made or patented under the provisions of this chapter (pre-emption), upon any land titled or equitably owned under color of title from the sovereignty of the State, evidence of the appropriation of which is on the county records or in the General Land Office; or when the appropriation is evidenced by the occupation of the owner or of some person holding for him."

Article 3951, Revised Statutes, prescribes the same in reference to homestead donations. The Revised Statutes, however, did not take effect until the 1st of September, 1879; therefore this article can have no effect upon the rights of Howell, as his right had attached prior thereto.

We do not think that it can be held that section 2, article 14, of the Constitution, is intended in any sense as a grant of land, and to make that a title which was before not a title, but void. It is but a reservation, if that. It does not operate upon the land, only in so far as it has relation to land certificates, fixing thereupon a limitation as to time and as to character of land upon which they may be located; and as pre-emption and homestead claims are not expressly inhibited from location, and are not expressly included within the terms of the proviso, they can not be said to be included by construction, unless such claims must be held to be certificates, or unless the effect of the proviso is to absolutely grant land which was not before granted.

*Walton & Hill*, for defendant in error.—1. On the first point we have to say: (1) If a grant originate through an officer of a former government, who, under the laws of such government, could be authorized to do the act he purports to perform, and he acts in the capacity of one who could do the act, then the validity of such act must be tested by the face of the documents which constitute this act, and no evidence aliunde the face of such documents can be received, save when such act is attacked by the State.

(2) That this rule has long existed in Texas and has become a rule of property, and the question taken the status of stare decisis.

(3) Section 2, article 14, of the Constitution of 1876, is but a declaration making organic law what the law had been by an unvarying line of decisions for full fifty years.

In the case of the Texas-Mexican Railway Company v. Locke, 74 Texas, 402, this court, after the most exhaustive investigation and elaborate opinion on the question before the court, lays this down to be the law of this State in regard to land titles emanating from a former government:

· "Many titles in this State would be uprooted if the law upon this subject [attacks on Mexican titles] was as contended for by appellant [who occupied the position of plaintiff in error in the case before the court], and in view of the course pursued by the Governor of the State and other officials [of the former government], who must be presumed to have understood their powers, and in good faith acted upon them, nothing short of a law clearly showing an usurpation of power would justify our holding that their acts were invalid. We therefore hold that the court did not err, in view of the other evidence [documentary and from the former government] in this case, in refusing to exclude the documents offered, on the ground that the commission of Soto had been annulled before he issued the titles."

The case quoted from, if it be not overruled, is decisive of the point now under discussion, both in and out of the presence of section 2, article 14, of the Constitution.

In that case, Fortunato Soto occupied the same position, viz., commissioner to distribute titles to the colonists in the colony of Beales and Grant, that Luke Lesassier did in the colony of Austin and Williams—only this, Lesassier was alcalde in addition to being commissioner. The court, in another part of the opinion, uses this very significant language, adopting what was said in Jenkins v. Chambers, 9 Texas, 234, viz: "The instructions to commissioners were repealed only so far as they were opposed to the provisions of the law of 1834—Decree 272, article 29, Laws Coahuila and Texas. Those [instructions] of the 4th September, 1827 [Id., decree, p. 70, under which Lesassier acted], were doubtless mainly intended for the government of commissioners for the distribution of lands to colonists proper. But their terms are sufficiently comprehensive to embrace, and they were made to embrace, other cases of concessions made under the law of 1825." The reason of the law which required the colonization contract should be carried out in accordance with the law of 1825, undoubtedly applied with equal force to the concessions in this case. 441. We construe the court to say, and to mean to say, that under the instructions of 1827 the commissioners for the distribution of lands to colonists had authority to issue titles on concessions, that is, concessions made for lands to Mexicans who were not colonists. Colonists did not receive concessions. They were simply domiciled in the colony, and received titles to their lands by virtue of their being so domiciled, and reckoned in the number of settlers the colonial contractors had bound themselves to introduce to entitle them to their premium lands. Concessions were granted only in sale under article 24 of the colonization laws of 1825. Laws of Coahuila and Texas, 19. So when the court says, "But their

terms [instructions] are sufficiently comprehensive to embrace, and they were made to embrace, other cases of concessions made under the law of 1825," it did say, and meant to say, that commissioners for the distribution of lands to the colonists were vested with authority to extend titles to those who were not colonists, but purchasers in sale by concessions from the Governor, under article 24, aforesaid.

Again, the court says as to void titles: "Grounds for forfeiture for noncompliance with conditions [conditions precedent] may exist. It may have been the intent of the grantees and Beales to acquire for him [under article 24] more land than the law permitted to be held by one person, and that on this ground forfeiture might be claimed by the State, or the holder of prior title or color of title; and it may be, and doubtless is true, that the commissioner issued title to lands not within the limits of the colony for which he was commissioner, and the grants in so far may be void; and it may be that the grants are situated within the limits then recognized by the authorities to be in the department of Bexar; but it does not follow, if all these things be true, that any of them can inure to the benefit of appellant.

"The concessions which conferred the right to purchase, if the record speaks the truth, were valid, and Soto had power to issue titles, if the instrument evidencing his authority be not false; and however much he may have exceeded his authority, the lands are nevertheless, within the meaning of article 14, section 2, of the Constitution, 'titled lands;'" citing Truehart v. Babcock, 51 Texas, 177; Westrope v. Chambers, 51 Texas, 187; Summers v. Davis, 49 Texas, 541; Winsor v. O'Connor, 69 Texas, 571. All of which cases we referred to in our original brief, on this motion for rehearing.

The court adds: "However defective the titles through which appellee's claim may be, they show such facts as deprive appellant of the right of mandamus." The lands were vacant and subject to location, or they were not vacant, but appropriated, and protected by the Constitution. The court says, that though the titles were void, because the commission of the officer had been annulled, because illegal and in violation of article 24, and because extended to lands outside the jurisdiction of the officer, yet the lands embraced therein come under the designation of "titled lands," and are protected from certificate location by the Constitution. So we read the decision, not because we so wish to read it, but because the language used is susceptible of no other reading.

The case of Massey v. Railway, 7 Texas Civil Appeals, 650, construes article 14, section 2, of the Constitution. In 1858 the Texas Legislature passed an act relinquishing title to certain claimants under a Mexican title, providing therein, that the beneficiaries should cause surveys of the relinquished lands to be made in all respects conforming to the metes and bounds designated in the original grant. A survey was made, but embraced more land than was contained in the boundaries of the original grant. Location was made on lands inside

the survey, but outside the metes and bounds of the original grant; and the issue in the case was as to whether the land so surveyed, but outside original metes and bounds, was protected from location by the article of the Constitution before named. The court held the locations bad; and further, that the land was protected, on the ground that it was equitably owned, etc., under the survey; and this notwithstanding patent had issued on the location. Citing Winsor v. O'Connor, 69 Texas, 571; Adams v. Railway, 70 Texas, 253.

In Groesbeck v. Harris, 19 Southwestern Reporter, 850, the court rules: "Where certain surveys were located, and field notes returned to the General Land Office, though not recorded in the county where made, they would be protected by section 2, article 14, of the Constitution."

Our conviction is, that the Constitution under discussion was ordained with an eye single to the quieting of land titles, in simple but full harmony with the rule of property long established, and in entire accord with stare decisis. One decision, well considered, and concurred in by an unanimous bench, on a specific subject matter, erects the bar of stare decisis. The rule is not inflexible, but should be adhered to, and not disregarded but on the fullest consideration and the conclusion reached that the law had been settled wrong. Sydnor v. Gascoigne, 11 Texas, 455; Smith v. Power, 23 Texas, 32; Burns v. Ledbetter, 56 Texas, 284.

But whether we be right in this, we doubt not that the first question submitted by the court is answered and settled by the authorities we have cited. We come fully under both clauses of section 2, article 14, of the Constitution.

(1) We have a title—written, valid on its face—whereby the government—taking the face of the title to be true—has parted with all its right in, fee to, and dominion over, the territory embraced within the boundaries set out in the grant.

(2) The land embraced in the grant is equitably owned by defendant in error, through a regular chain of title by grant from the sovereignty of the soil, by successive links of conveyance down to his ancestor, and by inheritance from him, covering a period of almost sixty-three years; and all this time no political step or proceeding in court has been taken by the State to annul, set aside, escheat, or cancel the title, she through all those years receiving taxes from the claimants on the land.

We believe the Constitution covers, guards, and protects us, and that we were protected by the law before the Constitution was adopted. If there were no other points in the case save those submitted by the court for argument, we should, from the standpoint of authority, confidently maintain that the shield of the Constitution interposes itself between us and the aggressions of certificate holders. If the State had attacked the title within a reasonable time, before private and innocent rights had grown up, the question for decision would have been mate-

rially different. But even then, we should not at all have been hopeless of maintaining the title even against sovereignty itself.

2. Conceding that the title of defendant in error is void, but, coming under the designation of "titled land," is protected from certificate location under section 2, article 14, of the Constitution, is it also so protected from invasion and appropriation by pre-emption and homestead claimants under Act of May 26, 1873, entitled "An act for the benefit of the occupants of the public domain?"

(1) Without express legislative declaration, we see no reason in law, and as little in morals, why a donation should take precedence over or stand on a higher plane than the payment of an honest, genuine debt; that is to say, there is lack of reason in the idea, that where the State gives her public domain away, the donee should take more privilege than the holder of a genuine land certificate who is entitled to resort to the public domain as a creditor to obtain satisfaction of his debt against the State. In the one case, the donee receives a gift; in the other, the holder of the certificate has value invested, either purchase money, services performed, or title by inheritance from one who had value invested. But if the law so enacts, that ends the matter, and we must deal with it as a legal fact. In this instance, however, we do not consider that the law itself so enacts, or that such a conclusion can be logically drawn from the words of the enactment.

(2) There is a legislative construction of section 2, article 14, of the Constitution, in regard to the rights of pre-emptors and occupants of public domain, viz., article 3936, Revised Statutes, as originally adopted. It is there declared, "No person shall settle upon or occupy, nor shall any survey be made or patented, under the provisions of this chapter, upon any 'titled land,' " etc., referring in the margin to the said article of the Constitution as basis for the enactment. Of course this was subsequent to the Act of 1873, but the substance (if not in hac verba) of that act was carried into the chapter of which article 3936 forms a part. The same prohibition is applied to homestead donations. Id., art., 3951.

(3) There are no specific or even general words or phrases in the Act of May 26, 1873, which indicate a preference to pre-emptors or homesteaders over certificate holders. In other acts of the Legislature such preferences have been expressed; for instance, in chapter 52, Session Acts 1879, page 48, whereby lands in certain counties were set apart for sale, the proceeds to be applied to designated purposes, the first section contained this clause: "The provisions of this act shall not be so construed as to prohibit the right of pre-empting within the bounds of the reservation here made;" and giving pre-emptors the same right to enter the reservation that they had to appropriate the land before it was made. In the Act of August 17, 1876, page 168, the actual settler has the right reserved to him to enter where the certificate holder may not go. The enactment is, "That all reservations of the public domain for the benefit of any railroad or railroad company heretofore made

by law, and the right to which reservation has lapsed since January 1, 1872, or may hereafter lapse, are hereby declared then to have been severed from the mass of the public domain, and in the event of a for-feiture to the State, are by this act expressly reserved from location, except the three millions of acres of lands reserved for constructing a new State capitol and other public buildings, and to actual settlers under the pre-emption laws," etc. There are other reservations which contain exceptions in favor of the pre-emptor, actual settler, and home-steader, but those named show the policy, idea, and practice of the lawmakers on this subject, viz., that when a class of persons is to be favored, or excepted from the general rule, the favor or exception is made in express words by affirmative enactment.

The Act of May 26, 1873, "An act for the benefit of actual occupants of the public lands," page 101, is lacking in express words that take the occupants mentioned out of the general rule, and we take it that they must abide in the status where the law leaves them. The first section is a mandatory order, requiring occupants at that date to return field notes within the time therein named, and regulating how patents may be obtained on the field notes so returned. The second section gives a right to make application for a homestead under the then ex-isting law regulating that subject matter, and upon conditions named. Section 3 is a regulation as to the survey, and exempting the home-steader from any character of payment, save fees due the surveyor's office and the General Land Office. Section 4 visits a penalty on the surveyor if he fail or refuse to make a survey, etc. The last section repeals all prior laws in conflict with the act.

(4) The keynote to the right of the occupants named in the law just mentioned comes out of the words "public domain," as used in sections 1 and 2. These words are not preceded by the words "vacant and un-appropriated," that are used in the Constitution, but we do not deem that omission to be of any material significance. The virtue rests in the words "public domain," whether prefixed by one term or another, unless the prefix embodies a preference or a prohibition. And this act embodies no prefix of one kind or another.

We then come in a simple and honest spirit to the consideration of the question as to what is the meaning of the words "public domain," under the Constitution and laws of Texas.

The best legal discussion as to what these words "public domain" mean, that we have seen, is made in the case of Day Land and Cattle Company v. The State, 68 Texas, 526, et seq., and the cases therein re-ferred to, holding the term equivalent to "unappropriated public domain."

BROWN, ASSOCIATE JUSTICE.—The defendant in error has filed a motion in this court for a rehearing, upon the following grounds:

1. Because the court erred in holding, that if Luke Lesassier made a valid grant of the eleven leagues of land to Rafael de Aguirre, on

the Brazos River, his power under the concession was exhausted, and the subsequent grant to the same party by virtue of the same concession was void.

4. Because the court has passed on a point not raised by the assignments of error, nor passed on by the Court of Civil Appeals.

5. Because the point passed on by this court was not an issue raised on the trial below, and was not and is not now an issue in the record by the pleading or assignments of error.

Upon the question as to whether the point decided is before this court, counsel for the motion are in error. In the petition for writ of error, the want of power in the commissioner, Lesassier, to issue a second grant upon the concession, is made in this language: "The court erred in holding that Lesassier had power to issue a second title after exhausting the concession by his granting the eleven leagues to Rafael de Aguirre, on the Brazos." (Counsel are aware that the decision followed Hanrick v. Jackson as to this particular, which this court is respectfully asked to open.) The defendant below, Howell, assigned as error the charge of the court upon which this question arose. The Court of Civil Appeals says: "Appellant excepts to the entire charge of the court. We have considered those portions of the charge specially pointed out as objectionable." And then proceeds to pass upon the special charges requested by the defendant below, as follows: "Special charge number 20 is the first called to our attention. This instruction contains several distinct propositions. The first of these propositions is as follows: 'You are charged, that the grant to Rafael de Aguirre, of October 4, 1833, on the Brazos, is a perfect and legal title, and that the extension of such grant exhausted the power of the commissioner, Lesassier, to extend title to Rafael de Aguirre by virtue of the concession of 14th June, 1830.' We think the court's charge sufficiently informs the jury that the grant to Rafael de Aguirre, dated October 4th, was a formal grant; that the extension of this grant exhausted the power of the commissioner conferred on him by the concession of 14th June, 1830, considered with reference to the testimony of this case, can not be maintained. Hanrick v. Jackson, 55 Texas, 31."

It will be seen that the Court of Civil Appeals did actually pass upon this identical question. In the brief of counsel for plaintiff in error this point was distinctly urged, and this court was called upon to review the case of Hanrick v. Jackson. It is no doubt true that counsel for defendant in error considered the question as settled by the decision in Hanrick v. Jackson, and therefore did not discuss it in their brief.

We have carefully reconsidered the case upon this motion, and have examined the authorities cited by counsel, but we find no reason to change our opinion as heretofore expressed.

Able counsel, with great labor and research, as shown by their presentation of the question, have not presented to us any authority

for the position that an alcalde, as such, ever had authority under the laws of Coahuila and Texas to grant the eleven leagues title.

The only authority which Lesassier had was the concession issued by the Governor on the 14th of June, 1830. This was a special authority to do a particular act, which, when done, fully satisfied and exhausted the authority vested in him.

Article 14, section 2, of the Constitution, contains this language: "All unsatisfied genuine land certificates now in existence shall be surveyed and returned to the General Land Office within five years after the adoption of this Constitution, or be forever barred; and all genuine land certificates hereafter issued by the State shall be surveyed and returned to the General Land Office within five years after their issuance, or be forever barred; provided, that all genuine land certificates heretofore or hereafter issued shall be located, surveyed, or patented only upon vacant and unappropriated public domain, and not upon any land titled or equitably owned under color of title from the sovereignty of the State, evidence of the appropriation of which is on the county records or in the General Land Office, or when the appropriation is evidenced by the occupation of the owner, or of some person holding for him."

This language applies alone to land certificates, and can not be construed to deny to any person the right to acquire any of the public domain subject to such acquisition by any lawful means, except by location under a land certificate.

We do not find it necessary in this case to determine whether this land would have been subject to location by a valid land certificate or not. In the view that we take of the case, the right of the defendant, Howell, to acquire the land under the Act of 1873, is to be determined independent of this section of the Constitution.

Howell's survey was made, as appears from the record, on the 4th day of May, 1876. At that time there was no law which prohibited the acquisition of this land under the Act of 1873, if it was unappropriated public domain. Article 3951 of the Revised Statutes of Texas was adopted in 1879, after the survey was made for the defendant, Howell. If that article had been in force at the time the survey was made, it would have presented the question as to whether the title under which Hanrick claims was such as to prevent the acquisition of the land by Howell; but, as we said before, this nor any other law was in force prohibiting settlement upon this land at the time the survey was made.

If the title under which Hanrick claims had been issued by any person authorized to grant such titles for the State of Coahuila and Texas, then such title, although voidable at the election of the State, would not have been void. But since, as we hold, Lesassier had no authority to make a second grant under the concession of June 14, 1830, his act in making the second grant, if it be a fact that he had previously made a valid grant by virtue of the same concession, was without any authority on his part, and had no more effect than if it had been made

by a person who never had the semblance of authority; in that event this would be a void grant, and would not appropriate the public domain of the State. Smith v. Power, 23 Texas, 34; Dawson v. McLeary, 29 S. W. Rep., 1044; Lindsey v. Miller, 6 Pet., 666.

The authorities cited by counsel for the defendant in error are cases in which the grant was made by an officer who had authority under the law to make grants of land, and which were not void, but voidable. That which is void is of no effect, and can confer no right, and that which confers a right can not be *void*. It is true, that in Winsor v. O'Connor, 69 Texas, 571, Judge Stayton says that the patent issued was void, but this is one of the instances in which the word void is used not in the sense of its being a nullity, but as being voidable. It was issued by an officer who had the authority to issue patents, and although issued upon a certificate which itself was wrongfully issued, yet it was the exercise of authority intrusted to him by law. In that case, Judge Stayton says: "Land is said to be 'titled' when a patent is issued, which on its face is evidence that the State has parted with its right and conferred it on the patentee. For reasons not appearing on the face of the patent, the grant may be void or voidable, but the land embraced in it is nevertheless 'land titled.'" This language has particular reference to the section of the Constitution quoted above, and that case is decided upon the construction of that section of the Constitution.

In the case of Railway v. Locke, 74 Texas, 370, there was a valid concession for each grant of land, and the commissioner had authority from the Governor of Coahuila and Texas to make each grant. It was charged, that the intention of getting the concessions to each one of the parties was to enable Beales to acquire more land than was authorized by the law; and also, that a portion of the land lay outside of the district for which the commissioner was empowered to act. In that case, the concession was the evidence of title, as in this. The extension of the title or the placing of the parties in possession of the land was the act of the commissioner. There was, as before stated, a valid concession for each survey, and valid authority for the act of the commissioner in extending the title to each.

The cases do not support the proposition, that a grant made without authority of the State, or by any person not empowered to make such grant, can confer any right whatever. If the fact be found that Lesassier had made a valid grant under the concession in question to De Aguirre, upon the Brazos River, prior to the making of the grant now in question, then the attempt to make a second grant by virtue of that concession was wholly unauthorized, and did not in any way appropriate the land or confer any right thereto, and in that event it was public and unappropriated public domain, subject to appropriation by the defendant Howell at the time that his survey was made.

The motion for a rehearing will be overruled.

*Overruled.*

Delivered June 24, 1895.